IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 17-cv-02010-PAB-KLM

BRENT EDWARD LOVETT,

     Plaintiff,

v.

TAMMY RUDA, individually and officially as Food Service Supervisor,
SAINT, individually and officially as Corrections Officer,
BOILING, individually and officially as Corrections Officer,
HARRISON, individually and officially as Corrections Officer,
THOMAS, individually and officially as Corrections Officer,
VERSAW, individually and officially as Corrections Officer,
MCCLENNON, individually and officially as Corrections Officer, and
PENA, individually and officially as Corrections Officer,

     Defendants.

_____

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

     This matter is before the Court on Defendants' **Motion to Dismiss** [#32][1] (the

"Motion"). Plaintiff filed a Response [#40] in opposition to the Motion, and Defendants[2] filed

a Reply [#41]. The Motion has been referred to the undersigned for recommendation

pursuant to 28 U.S.C. § 636(b) and D.C.COLO.LCivR 72.1(c). *See* [#33]. Having reviewed

---

[1] "[#32]" is an example of the convention the Court uses to identify the docket number
assigned to a specific paper by the Court's electronic case filing and management system
(CM/ECF). This convention is used throughout this Recommendation.

[2] For purposes of this Recommendation, the term "Defendants" does not include Defendant
Thomas in her individual capacity, because she has not been properly served. *See Motion* [#32]
at 5 (stating that counsel only represents Defendant Thomas in her official capacity); *Notice of Entry
of Appearance* [#27] (entering "appearance on behalf of all Defendants in their official capacities").
*See* § III.B. below (discussing Order to Show Cause [#37] regarding Defendant Thomas).

the entire case file and being sufficiently advised, the Court respectfully **RECOMMENDS** that the Motion [#32] be **GRANTED in part and DENIED in part**.

## I. Summary of the Case

At all times relevant to this lawsuit, Plaintiff has been a prisoner in the custody of the United State Bureau of Prisons ("BOP") at the Florence Prison Camp ("FPC") in Florence, Colorado. *Second Am. Compl.* [#13] at 2. Defendants in this matter consist of the Food Service Supervisor Tammy Ruda ("Ruda") and Correctional Officers Saint, Boling,[3] Harrison, Thomas, Versaw, McClendon,[4] and Pena. *Id.* at 2-3.

Plaintiff suffers from celiac disease,[5] and, in connection with the following events, he asserts three constitutional claims primarily relating to the provision of his food by the BOP's staff: (1) "Eighth Amendment, Deliberate Indifference, Cruel and Unusual Punishment, Deprivation of Food and Fiber," (2) "Equal Protection Claim" under the Fourteenth Amendment, (which he combines with a claim under the American with Disabilities Act ("ADA")), and (3) "Retaliation" under the First Amendment. *Id.* at 17-20. All three claims appear to be asserted against all Defendants. *See id.* In short,[6] Plaintiff

---

[3] Incorrectly named "Boiling" by Plaintiff in the Second Amended Complaint. *See* [#13] at 1, 2; *Motion* [#32] at 4 n.1. The correct spelling is used throughout this Recommendation.

[4] Incorrectly named "McClennon" by Plaintiff in the Second Amended Complaint. *See* [#13] at 1, 3; *Motion* [#32] at 6 n.3. The correct spelling is used throughout this Recommendation.

[5] Plaintiff describes celiac disease as "a cell-mediated allergic reaction to Glutten [sic] that results in an inflammation of the lower gastro-intestinal tract." *Second Am. Compl.* [#13] at 4. "The immune system response to Glutten [sic] is immediate against the invading organisms (Glutten [sic]), which results in the bodies [sic] immune system to attack [sic] its own body tissue, which results in permanent intestinal damage or enteropathy." *Id.* "This damage permits toxins, bacteria and undigested food proteins to seep through the GI barrier and into the body." *Id.*

[6] The allegations underlying these claims are discussed in detail in the Analysis section below. The Court construes all of the well-pled allegations in the Second Amended Complaint in

complains about the food he receives in prison, alleging that, since his incarceration, there have been many times when he has not been fed or has only been provided food containing gluten or other contaminants. *See id.* at 4-16. He also alleges that, when he has complained about the food through the use of the grievance system or otherwise, Defendants have "stepped up the harrassment [sic] and denial of food . . . ." *See generally id.* at 20.

As a result of these circumstances, Plaintiff seeks damages against the individual Defendants[7] and injunctive relief requiring BOP staff in their official capacities "to provide the Gluten-Free diet as directed by the BOP Medical Department, and to cease their harassment of [Plaintiff], and order that the BOP can not relocate [Plaintiff] in an effort to avoid this action . . . ." *Id.* at 27. In the present Motion [#32], Defendants seek dismissal of Plaintiff's claims pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## II. Standards of Review

### A.    Federal Rule of Civil Procedure 12(b)(1)

The purpose of a motion to dismiss pursuant to Rule 12(b)(1) is to test whether the Court has jurisdiction to properly hear the case before it. Because "federal courts are courts of limited jurisdiction," the Court must have a statutory basis to exercise its jurisdiction. *Montoya v. Chao*, 296 F.3d 952, 955 (10th Cir. 2002); Fed. R. Civ. P. 12(b)(1).

---

favor of Plaintiff. *See Barnes v. Harris*, 783 F.3d 1185, 1191-92 (10th Cir. 2015).

[7] The Second Amended Complaint appears to seek monetary relief from Defendants in only their individual capacities. [#13] at 27. Defendants' Motion operates under this assumption. [#32] at 1 (stating that Plaintiff "makes *Bivens* claims against Defendants in their individual capacities and seeks declaratory and injunctive relief against Defendants in their official capacities"). Plaintiff does not contest this characterization in his Response [#40].

Statutes conferring subject-matter jurisdiction on federal courts are to be strictly construed. *F & S Const. Co. v. Jensen*, 337 F.2d 160, 161 (10th Cir. 1964). "The burden of establishing subject-matter jurisdiction is on the party asserting jurisdiction." *Id.* (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)).

A motion to dismiss pursuant to Rule 12(b)(1) may take two forms: facial attack or factual attack. *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995). When reviewing a facial attack on a complaint, the Court accepts the allegations of the complaint as true. *Id.* By contrast, when reviewing a factual attack on a complaint, the Court "may not presume the truthfulness of the complaint's factual allegations." *Id.* at 1003. With a factual attack, the moving party challenges the facts upon which subject-matter jurisdiction depends. *Id.* The Court therefore must make its own findings of fact. *Id.* In order to make its findings regarding disputed jurisdictional facts, the Court "has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing." *Id.* (citing *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990); *Wheeler v. Hurdman*, 825 F.2d 257, 259 n.5 (10th Cir. 1987)). The Court's reliance on "evidence outside the pleadings" to make findings concerning purely jurisdictional facts does not convert a motion to dismiss pursuant to Rule 12(b)(1) into a motion for summary judgment pursuant to Rule 56. *Id.*

**B.      Federal Rule of Civil Procedure 12(b)(6)**

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test "the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994); Fed. R. Civ. P. 12(b)(6) (stating that a complaint may be dismissed for "failure to state a claim upon which relief can be granted"). "The court's function on a Rule 12(b)(6) motion is not to

weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Sutton v. Utah State Sch. for the Deaf & Blind,* 173 F.3d 1226, 1236 (10th Cir. 1999) (citation omitted). To withstand a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain enough allegations of fact 'to state a claim to relief that is plausible on its face.'" *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Bell Atlantic Co. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007) ("The complaint must plead sufficient facts, taken as true, to provide 'plausible grounds' that discovery will reveal evidence to support the plaintiff's allegations." (quoting *Twombly*, 550 U.S. at 570)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Id.* (brackets in original; internal quotation marks omitted).

To survive a motion to dismiss pursuant to Rule 12(b)(6), the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1191 (10th Cir. 2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," a factual allegation has been stated, "but it has not show[n][ ]that the pleader is entitled to relief," as required by Fed. R. Civ. P. 8(a). *Iqbal*, 552 U.S. at 679 (second brackets added; citation and internal quotation marks omitted).

### C.    Pro Se Litigants

The Court must construe liberally the filings of pro se litigants.  *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  However, the Court should not be the pro se litigant's advocate, nor should the Court "supply additional factual allegations to round out [the pro se litigant's] complaint or construct a legal theory on [his] behalf." *Whitney v. New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997) (citing *Hall*, 935 F.2d at 1110).  In addition, pro se litigants must follow the same procedural rules that govern other litigants.  *Nielsen v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994).

### III.  Analysis

### A.    Jurisdiction Over Official Capacity Claims

Defendants argue that "Plaintiff does not provide a basis for the Court's jurisdiction over any official-capacity claims." *Motion* [#32] at 23.  "When an action is one against named individual defendants, but the acts complained of consist of actions taken by defendants in their official capacity as agents of the United States, the action is in fact one against the United States." *Atkinson v. O'Neill*, 867 F.2d 589, 590 (10th Cir. 1989). Accordingly, the United States has effectively been named as a defendant in this case. *See Davis v. Holder*, No. 12-cv-02122-REB-KMT, 2014 WL 1713429, at *6 (D. Colo. Apr. 23, 2014) (citing *Atkinson*, 867 F.2d 589, 590 (10th Cir. 1989)).

As noted above, Plaintiff asserts claims seeking only non-monetary relief against Defendants in their official capacities.  Plaintiff asserts, in part, that the Court has jurisdiction pursuant to 28 U.S.C. § 1331.  *Second Am. Compl.* [#13] at 4.  Legal authority

from the Tenth Circuit Court of Appeals makes clear that 28 U.S.C. § 1331 provides jurisdiction over claims for equitable relief arising under federal law, and such claims are not barred by the doctrine of sovereign immunity. *Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1233 (10th Cir. 2005). The Administrative Procedures Act ("APA"), 5 U.S.C. § 702, waives sovereign immunity in most suits for claims "other than money damages." *Id.* at 1238-39 (finding that the BOP is an agency subject to the waiver of sovereign immunity in § 702, and therefore sovereign immunity did not bar the prisoner-plaintiff's Eighth Amendment claim for denial of dental care).

Although Plaintiff does not mention the APA, or even *Simmat*, in his Second Amended Complaint, he has affirmatively invoked federal question jurisdiction under 28 U.S.C. § 1331. [#13] at 4. Defendants have not directed the Court's attention to any case, and the Court is aware of none, in which a pro se prisoner-plaintiff's claims for non-monetary relief against prison officials in their official capacities have been dismissed under similar circumstances, and, given the clarity of the law in this area that the Court does in fact have jurisdiction over these types of claims, the Court **recommends** that Defendants' request to dismiss Plaintiff's official capacity claims on this basis be **denied**.

## B. Order to Show Cause re: Defendant Thomas

On January 31, 2018, the Court issued an Order to Show Cause [#37] directing Plaintiff to show cause why the Court should not recommend that the case against Defendant Thomas be dismissed pursuant to Fed. R. Civ. P. 4(m). In that Order, the Court noted that Defendant "CO Thomas" had not been served with the Summons and Amended Complaint in this action and, therefore, that he was not currently a proper party.

Plaintiff filed this civil action on August 21, 2017.  *See Compl.* [#1].  The Second Amended Complaint [#13] was filed on September 28, 2017.  On October 4, 2017, *see* [#16], the United States Marshal was directed to serve a copy of the Summons and Second Amended Complaint on all Defendants in the above-captioned matter.  On December 12, 2017, a Waiver of Service of Summons [#26] was returned unexecuted as to Defendant Thomas with a notation that she was "currently on extended military leave away from the institution."  No forwarding address was provided.

As the Court explained in the Order to Show Cause [#37], while Fed. R. Civ. P. 4(c) requires that the Court effect service of the Summons and Amended Complaint for a plaintiff who is proceeding in forma pauperis, as Plaintiff is here, *see Order* [#11], the plaintiff must provide sufficient information for the Court to do so.  *See Hill v. Ortiz*, No. 07-cv-00571-LTB-CBS, 2008 WL 2020289, at *6 (D. Colo. May 9, 2008).  In the absence of information which would allow service on Defendant Thomas, Plaintiff was directed to show cause why the Court should not recommend that the case against Defendant Thomas be dismissed pursuant to Fed. R. Civ. P. 4(m) & 41(b).  Plaintiff was directed to file proof of service on Defendant Thomas, or respond, in writing, to the Order to Show Cause on or before March 2, 2018.  Plaintiff was warned that failure to serve Defendant Thomas, respond and show good cause for his failure to properly serve this Defendant, or provide a current address to allow the United States Marshal to effect service, would result in the issuance of a recommendation to dismiss Plaintiff's action as to Defendant Thomas.

Since issuing the Order to Show Cause [#37], Plaintiff has sought entry of default by the Clerk of Court and entry of default judgment by the District Judge, both of which have been denied.  *See* [#39, #42].  Plaintiff did not otherwise respond to the Order to

Show Cause [#37], and thus has not provided any information that the Court can use to effect service on this Defendant. On January 29, 2018, Defendants' counsel clarified that she represented Defendant Thomas, but in her official capacity only. *See Motion* [#32] at 5 n.2. Accordingly, to the extent the Order to Show Cause [#37] was directed at Defendant Thomas in her official capacity, the Order to Show Cause is **discharged**.

Pursuant to Fed. R. Civ. P. 4(m), the deadline for service on Defendant Thomas in her individual capacity has now expired. At this stage, it is clear that Plaintiff cannot provide the necessary information to effect service on Defendant Thomas. Although the Court may extend the time for a plaintiff to serve a defendant even without a showing of good cause, *Espinoza v. United States*, 52 F.3d 838, 840-41 (10th Cir.1995), the Court is not inclined to do so here. The case against Defendant Thomas has been pending since August 2017. Plaintiff failed to effect service of Defendant Thomas within ninety days of her inclusion in this case, failed to provide sufficient contact information for the Court to do so, and failed to provide good cause for the Court to find that an opportunity exists to cure the service deficiency in the future. Further, Plaintiff was warned in advance that the penalty for lack of service or for failing to provide good cause for the service delay would be dismissal of the unserved Defendant. *See generally Raeth v. Bank One*, 05-cv-02644-WDM-BNB, 2008 WL 410596, at *3 & n. 4 (D. Colo. Feb. 13, 2008). Regardless of Plaintiff's desire to keep Defendant Thomas in the case and have her answer the claims asserted against her, neither can be accomplished without service.

Accordingly, the Order to Show Cause [#37] is made **absolute** as to Defendant Thomas in her individual capacity, and the Court **recommends** that Defendant Thomas in

her individual capacity be **dismissed without prejudice**.  *See Banks v. Katzenmeyer*, 680 F. App'x 721, 724 (10th Cir. 2017) (stating that dismissal without prejudice pursuant to Fed. R. Civ. P. 41(b) does not require consideration of the factors listed in *Ehrenhaus v. Reynolds*, 965 F.2d 916 (10th Cir. 1992)).

## C.    ADA

Defendants do not address Plaintiff's claim under the American with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.  *See Second Am. Compl.* [#13] at 19 ("Defendants violated [Plaintiff's] right to food in violation of the [ADA] by failing to supply calorically sufficient foods and fiber which was [sic] supplied to and enjoyed by all other inmates."). However, because Plaintiff proceeds in forma pauperis, *see Order* [#11], the Court may address this claim sua sponte pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).

Although Plaintiff does not refer to any specific Title of the ADA, his allegations appear to most closely refer to a violation of Title II, which states, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  However, "Title II of the ADA does not apply to federal prisoners in federal prisons . . . ."  *Phillips v. Tiona*, 508 F. App'x 737, 752 (10th Cir. 2013).  "That is so because Title II covers only states and defined appendages thereof."  *Id.*

Accordingly, the Court **recommends** that Plaintiff's ADA claim be **dismissed with prejudice** as to all Defendants in both their official and individual capacities.  *See Reynoldson v. Shillinger*, 907 F.2d 124, 127 (10th Cir. 1990) (stating that prejudice should

attach to a dismissal when the plaintiff has not made allegations "which, upon further investigation and development, could raise substantial issues").

**D.      Statute of Limitations**

Defendants argue that all claims against Defendant Saint and Boling should be dismissed as violating the statute of limitations, and that the claims against Defendant Ruda should be "limited" on that same basis. *Motion* [#32] at 23-24; *Reply* [#41] at 7-8. A statute of limitations defense may be resolved on a motion to dismiss where application of the limitations period is apparent on the fact of the complaint. *Dummar v. Lummis*, 543 F.3d 614, 619 (10th Cir. 2008).

Colorado's general two-year statute of limitations, Colo. Rev. Stat. § 13–80–102, applies to actions arising under 42 U.S.C. § 1983. *Fogle v. Pierson*, 435 F.3d 1252, 1258 (10th Cir. 2006). Generally, "claims accrue and the statute of limitations begins to run when the plaintiff knows or has reason to know of the existence and cause of the injury which is the basis of his action." *Alexander v. Oklahoma*, 382 F.3d 1206, 1215 (10th Cir. 2004). "A plaintiff has reason to know of his injury when he should have discovered it through the exercise of reasonable diligence." *Indus. Constructors Corp. v. U.S. Bureau of Reclamation*, 15 F.3d 963, 969 (10th Cir. 1994).

Plaintiff filed this lawsuit on August 21, 2017, and thus, generally speaking, any claim based on conduct which occurred prior to August 21, 2015, is time-barred. *See Fogle*, 435 F.3d at 1258. Plaintiff does not dispute that all allegations asserted against Defendant Boling occurred prior to August 2015. *Response* [#40] at 15. In fact, the most recent actions allegedly taken by Defendant Boling appear to have occurred in March 2015. *See Second Am. Compl.* [#13] at 7, 22. With respect to Defendant Ruda, her allegedly

relevant involvement in this case ranges from October 6, 2014, to September 2, 2017, a time frame which partially precludes the statute of limitations defense . *Second Am. Compl.* [#13] at 6, 16.

With respect to Defendant Saint, Plaintiff asserts that he "claims actions against . . . Saint[ ] up to the time of notice of injury and throughout 2016 in the Nature of the case, and the exhibits and Declarations submitted." *Response* [#40] at 15. Plaintiff did not, however, direct the Court's attention to any specific place in his filings where he alleged that Defendant Saint took any action after August 2015. *See id.* In reply, Defendants note that they "cannot identify any allegations against Saint less than two years before the filing date." *Reply* [#41] at 8. The Court has also independently examined the Second Amended Complaint [#13] and its voluminous attachments [#1-1] incorporated by Plaintiff,[8] and has found no instance of allegations against Defendant Saint occurring within the statute of limitations. Thus, the Court finds that the alleged actions in the Second Amended Complaint by Defendant Saint all occurred prior to the limitations period.

On September 4, 2015, Plaintiff was diagnosed with sigmoid diverticulosis.[9] *Second Am. Compl.* [#13] at 11-12. This event occurred slightly less than two years before he filed this lawsuit, and Defendants concede that claims based on this injury therefore appear to be timely, with which the Court agrees. *See Reply* [#41] at 7. However, to the extent that any of Plaintiff's claims are based on other purported injuries stemming from conduct

_____

[8] The Court may consider all documents attached as exhibits to the Second Amended Complaint. *See Oxendine v. Kaplan*, 241 F.3d 1272, 1275 (10th Cir. 2001).

[9] Although Plaintiff does not clearly explain this diagnosis, he does allege that it is a serious injury involving his colon which stems from improper management of his celiac disease. *See Second Am. Compl.* [#13] at 11-12.

occurring prior to August 21, 2015, such as, for example, retaliatory conduct due to his complaints about the food, such claims are time-barred.

Accordingly, the Court **recommends** that the Motion [#32] be **granted** with respect to (1) Plaintiff's First and Fourteenth Amendment claims for retaliation and equal protection against Defendants Boling and Saint; (2) Plaintiff's First and Fourteenth Amendment claims for retaliation and equal protection against Defendant Ruda to the extent these claims are based on conduct occurring prior to August 21, 2015; and (3) Plaintiff's Eighth Amendment claim for deliberate indifference against Defendants Boling, Saint, and Ruda to the extent this claim is based on purported injuries *other than* sigmoid diverticulosis stemming from conduct occurring prior to August 21, 2015, and that these claims against Defendants in both their official and individual capacities be **dismissed with prejudice** on the basis of statute of limitations.  *See Gee v. Pacheco*, 627 F.3d 1178, 1195 (10th Cir. 2010) (stating that claims barred by the statute of limitations may be dismissed with prejudice because permitting amendment of those claims would be futile).

## E.    Official and Individual Capacity Fourteenth Amendment Claims

Plaintiff argues that his equal protection rights were violated because Defendants deprived him "of the foods and fiber as was [sic] provided to all other similarly situated inmates."  *Second Am. Compl.* [#13] at 19.

The Equal Protection Clause of the Fourteenth Amendment provides that "no State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  This guarantee "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike."  *Nordinger v. Hahn*, 505

U.S. 1, 10 (1992)). This means, in short, that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

In the prison context, success on an equal protection claim requires an inmate to show that he was "similarly situated" to other inmates who are treated differently, and that the difference in treatment was not "reasonably related to legitimate penological interests." *Fogle*, 435 F.3d at 1261; *Templeman v. Gunter*, 16 F.3d 367, 371 (10th Cir. 1994). If the classification is not made with respect to any suspect category such as, for example, race, then the classification is subject only to "rational-basis review" and "must be upheld if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Commc'n, Inc.*, 508 U.S. 307, 313 (1993). A plaintiff who asserts that another similarly-situated inmate is receiving more favorable treatment must show that the two are alike "in every relevant respect." *Templeman*, 16 F.3d at 371; *Meek v. Jordan*, 534 F. App'x 762, 764 (10th Cir. 2013).

Here, Plaintiff is not alleging that he is being treated differently from other inmates because of his race or any other suspect classification or membership in a protected class. *See Second Am. Compl.* [#13] at 19. He conclusorily states that he was similarly situated to prisoners who were adequately fed. *See id.* He also asserts that gluten-free inmates at other BOP prison facilities have been adequately fed. *See id.*; *see also Response* [#40] at 11-12.

However, the allegations provided in the Second Amended Complaint belie these assertions, because every allegation about the other gluten-free inmates in Plaintiff's prison facility (of which there seems to be only one) describes how Plaintiff and that inmate were treated the same. *See, e.g.*, *Second Am. Compl.* [#13] at 13 (stating that Defendant

Harrison "refuses to provide food to the Gluten free inmates"), 14 (describing "the fact that both Gluten-free inmates got sick from consuming the tainted foods" and that later "the Gluten-Free inmates only received 80 calories to eat"), 15 (stating that Defendant Ruda told Defendant Harrison "not to feed the Gluten-Free inmates" and that "[f]or 3 days the Gluten-Free inmates were not receiving food").  By these allegations, Plaintiff alleges that he was *not* treated differently from "other inmates who are similar in every relevant respect."  *See Templeman*, 16 F.3d at 371.  In fact, he has merely alleged the opposite, i.e., that he has been treated the same as the one other similarly situated inmate at his facility.  With respect to the non-gluten-free inmates, Plaintiff's complaint is focused on the fact that he has *not* been treated differently from them, i.e., that he has been provided the same food given to the non-gluten-free inmates.  His stated problem, though, is that he cannot eat the same food given to the non-gluten-free inmates, and he therefore should be treated differently.  This simply cannot be the basis of an equal protection claim.

Accordingly, the Court **recommends** that Plaintiff's Fourteenth Amendment claim be **dismissed with prejudice** as to all Defendants in both their official and individual capacities.  *Reynoldson*, 907 F.2d at 127.

## F.    Official and Individual Capacity First Amendment Claims

Plaintiff asserts that he filed grievances against Defendants "for failing to provide food and fiber," and that thereafter, "Defendants stepped up the harrassment [sic] and denial of food to [Plaintiff] after each time . . . ."  *Second Am. Compl.* [#13] at 20.

"[Prison] officials may not retaliate against or harass an inmate because of the inmate's exercise of his constitutional rights . . . even where the action taken in retaliation

would be otherwise permissible." *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998). A First Amendment retaliation claim is analyzed under the three-part test enunciated in *Shero v. City of Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007). *Flute v. United States*, 723 F. App'x 599, 603 (10th Cir. 2018) (discussing application of the *Shero* test to a BOP inmate's First Amendment retaliation claim). First, Plaintiff must allege that he "was engaged in constitutionally protected activity." *Shero*, 510 F.3d at 1203. Second, he must allege that each Defendant's "actions caused [him] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity." *Id.* Third, he must provide allegations demonstrating that each Defendant's "adverse action was substantially motivated as a response to [his] exercise of constitutionally protected conduct." *Id.*

Defendants primarily argue that Plaintiff fails to state a retaliation claim because he has failed to sufficiently allege the third element. *Motion* [#32] at 21-22. With respect to this element, a plaintiff "must prove that 'but for' the retaliatory motive, the incidents to which he refers . . . would not have taken place." *Smith v. Maschner*, 899 F.2d 940, 949-50 (10th Cir. 1990). Close temporal proximity between protected conduct and the ensuing detrimental action may show that the action was substantially motivated by the exercise of a protected right. *Lewis v. Clark*, 577 F. App'x 786, 800 (10th Cir. 2014); *Gee*, 627 F.3d at 1189.

As Defendants argue, *see Motion* [#32] at 22; *Reply* [#41] at 6-7, "by definition, where a person alleges that another has retaliated against them [sic] because of the person's prior protected activity, an essential element of the claim is that the person engaging in the retaliatory action must be shown to have had foreknowledge of that protected activity." *Gambina v. Fed. Bureau of Prisons*, No. 10-cv-02376-MSK-KLM, 2011

WL 4502085, at *11 (D. Colo. Sept. 29, 2011). In other words, "Defendants cannot have intended to retaliate against [Plaintiff] for an act that the Defendants were not aware had occurred." *Id.* Here, there are no allegations from which the Court can plausibly infer that Defendants Harrison, Thomas, Versaw, McClendon, or Pena knew of Plaintiff's various Inmate Requests to Staff or Trulincs submissions.[10]

Plaintiff argues that these Defendants were informed of his submissions because the BOP's Program Statement regarding the Administrative Remedy Program, § 1330.18, "requires each staff member be notified of any grievance filed concerning their actions." *Response* [#40] at 14. However, the Court has reviewed this provision and finds no such requirement embedded therein; rather, the investigative staff person appears to have discretion on this point. *See* § 1330.18(13)(b). Regardless, even if there were little or no discretion here, the subsection to which Plaintiff seems to refer only applies to formal grievances; it is simply not connected with any informal grievance resolution, including Inmate Request to Staff forms, Trulincs submissions, or even Informal Resolution Forms, i.e., BP-8. It only discusses "Requests" which by definition are formal Administrative Remedy Requests written on the BP-9 form.[11]

The only formal grievance filed by Plaintiff was his March 30, 2015 BP-9 submission. *Second Am. Compl.* [#13] at 8 (citing *Pl.'s Ex. 17* [#1-1] at 24-27). This grievance was filed nearly five months before the statute of limitations cut-off in this case, thus foreclosing the

---

[10] Although Trulincs is not explained by the parties, it appears to be an internal prison e-mail-like electronic system for communication between prisoners and prison staff. *See, e.g.*, *Pl.'s Ex. 40* [#1-1] at 48.

[11] "Appeals" are also discussed in this section but are irrelevant to this analysis.

possibility of any "close temporal proximity" between Plaintiff's protected action and any purported retaliatory action, given that Plaintiff fails to allege that any staff member learned of his BP-9 submission at a time within or close to the statute of limitations cut-off, i.e., August 21, 2015. *See United States v. Camick*, 796 F.3d 1206, 1225-26 (10th Cir. 2015). Further, even assuming that Plaintiff is correct that the Administrative Remedy Program contains a requirement that staff members identified in a grievance be notified of the grievance against them, neither Plaintiff's informal BP-8 submission nor formal BP-9 submission refers to any staff member by name. *Pl.'s Ex. 13* [#1-1] at 19 (BP-8); *Pl.'s Ex. 17* [#1-1] at 24-27 (BP-9).

As for Plaintiff's plethora of informal complaints, Plaintiff does not direct the Court's attention to any specific example of his submission of a complaint and subsequent retaliation by Defendants Harrison, Thomas, Versaw, McClendon, or Pena. *See Response* [#40] at 13-14; *Second Am. Compl.* [#13] at 20. For example, Plaintiff's August 30 and October 9, 2015 Trulincs Requests; January 14, 2016 Trulincs Request; April 6 and December 5, 2016 Inmate Requests to Staff; and January 15, March 10, and March 15, 2017 Trulincs Requests do not specify any staff member by name. *Second Am. Compl.* [#13] at 11-14 (citing *Pl.'s Ex. 26* [#1-1] at 35; *Pl.'s Ex. 29* [#1-1] at 37; *Pl.'s Ex. 31* [#1-1] at 39; *Pl.'s Ex. 33* [#1-1] at 41; *Pl.'s Ex. 36* [#1-1] at 44; *Pl.'s Ex. 37* [#1-1] at 45; *Pl.'s Ex. 40* [#1-1] at 48; *Pl.'s Ex. 41* [#1-1] at 49).

Plaintiff's March 14, 2016 Trulincs Request mentions Defendant Harrison, *see Pl.'s Ex. 32* [#1-1] at 40, but the first action alleged to have been taken thereafter by Defendant Harrison against Plaintiff occurred on September 30, 2016, when Defendant Harrison allegedly failed to provide Plaintiff with food. *Second Am. Compl.* [#13] at 22. Plaintiff's

April 7, 2016 Trulincs Request mentions Defendant Thomas, *see Pl.'s Ex. 34* [#1-1] at 42, but the first action alleged to have been taken thereafter by Defendant Thomas against Plaintiff occurred on October 2, 2016, when Defendant Thomas allegedly failed to provide Plaintiff with food. *Second Am. Compl.* [#13] at 23. Without more, a period of two or more months between a protected activity and alleged retaliatory action is insufficient to create an inference of retaliatory intent. *See United States v. Camick*, 796 F.3d 1206, 1225-26 (10th Cir. 2015). Here, six-and-a-half months passed before Defendant Harrison's first allegedly retaliatory action, and six months passed before Defendant Thomas's first allegedly retaliatory action. Plaintiff's protected activity and these Defendants' alleged retaliatory actions are simply too remote in time to create an inference of retaliatory intent, and Plaintiff's retaliation claims against them fail as a result.

Plaintiff's February 8, 2017 document addressed to Warden Getz mentions Defendants McClendon and Versaw, *see Pl.'s Ex. 39* [#1-1] at 47, but there are several issues here. First, the allegations of their failure to provide food to Plaintiff started long before this document was sent to Warden Getz and continue for some time after February 8, 2017, thus counseling against a finding of "but-for" causation. *Second Am. Compl.* [#13] at 23; *see Shero*, 510 F.3d at 1203 (stating that the adverse action must be "substantially motivated *as a response to*" the exercise of the plaintiff's right (emphasis added)). Second, the allegations of Defendant Versaw's humiliation of Plaintiff also start long before February 8, 2017, and continue for some time after. *Second Am. Compl.* [#13] at 23; *see Shero*, 510 F.3d at 1203. Third, there are no allegations that either Defendant McClendon or Defendant Versaw knew anything about this document at any time before or after it was delivered to Warden Getz. *See id.* at 14; *see Gambina*, 2011 WL 4502085, at *11 (stating

that "foreknowledge of [the] protected activity" prior to the alleged retaliatory conduct is required). For these reasons, Plaintiff's retaliation claim against these two Defendants fails.

Finally, with respect to Defendant Ruda, although Plaintiff has not clearly directed the Court's attention to which specific allegations directly support his retaliation claim against her, the Court nevertheless finds that he has plausibly stated such a claim as to Defendant Ruda at this early stage of the proceedings. On January 15, 2017, Plaintiff sent Defendant Ruda a Trulincs Request "detailing the weeks and months without proper food, without the proper calories, the daily ridiclue [sic] and violation of our civil rights . . . ." *Second Am. Compl.* [#13] at 14 (citing *Pl.'s Ex. 37* [#1-1] at 45). Then, five days later on January 20, 2017, Defendant Ruda "directly supervised that [Plaintiff] did not receive any eatable food." *Second Am. Compl.* [#13] at 21. On February 8, 2017, Plaintiff sent another document to Defendant Ruda and to Warden Getz "denoting the on-going problems with food service and the lack of food being provided to the Gluten-free inmates." *Id.* at 14 (citing *Pl.'s Ex. 39* [#1-1] at 47). Then, two days later on February 10, 2017, Defendant Ruda "directly supervised that [Plaintiff's] meal was uneatable, and thus [Plaintiff] did not receive any food to eat." *Second Am. Compl.* [#13] at 21. On March 10, 2017, Plaintiff sent Defendant Ruda another Trulincs Request, "stating that FPC Food Service staff is refusing to feed the Gluten-Free inmates." *Id.* at 14 (citing *Pl.'s Ex. 40* [#1-1] at 48. That same day, Defendant Ruda "directly supervised that [Plaintiff] did not receive any food." *Second Am. Compl.* [#13] at 21.[12]

---

[12] The Court notes that is unclear which of these events occurred first on March 10, but the Court reads the Second Amended Complaint in a light most favorable to Plaintiff. *See Barnes*, 783 F.3d at 1191-92.

These allegations[13] are enough to plausibly demonstrate that "but for" Defendant Ruda's retaliatory motive, the incidents to which Plaintiff refers would not have taken place. He sufficiently alleges that Defendant Ruda knew of his allegedly protected actions, *see Gambina*, 2011 WL 4502085, at *11, and the close temporal proximity between Plaintiff's conduct and Defendant Ruda's actions is enough to show that her actions may have been substantially motivated by the exercise of Plaintiff's protected rights. *See Smith*, 899 F.2d at 949-50; *Lewis*, 577 F. App'x at 800; *Gee*, 627 F.3d at 1189. Accordingly, the Court finds that Plaintiff has adequately alleged a violation of his First Amendment rights by Defendant Ruda.

Accordingly, the Court **recommends** that Plaintiff's First Amendment retaliation claim be **dismissed with prejudice** with respect to Defendants Harrison, Versaw, McClendon, Thomas, and Pena in both their official and individual capacities. *Reynoldson*, 907 F.2d at 127. The Court further **recommends** that the Motion [#32] be **denied** with respect to Defendant Ruda in her official capacity on this claim.[14]

## G.    Official Capacity Eighth Amendment Claims

At the outset, the Court is compelled to note that Plaintiff's allegations paint a portrait of a man who has been half-starved throughout his time in prison on the basis of frequently being provided by prison officials with food that is contaminated in various ways or by being provided with little or no food on a regular basis. The allegations are highly concerning to

---

[13]   The Court does not imply that these are the only incidents of purported retaliation by Defendant Ruda which are at issue in this case, but rather notes only that these alleged incidents provide examples enough for Plaintiff's retaliation claim to survive as to this Defendant.

[14]   The Court addresses Plaintiff's First Amendment claim with respect to Defendant Ruda in her individual capacity in Section III.H. below.

the Court in that they provide a conceivable basis for Eighth Amendment causes of action against many Defendants here. However, "conceivable" is not the standard which Plaintiff must meet; rather, Plaintiff must "nudge his claims across the line from conceivable to plausible." *Requena v. Roberts*, 893 F.3d 1195, 1205 (10th Cir. 2018) (citation omitted). Plaintiff bears "the burden of alleging sufficient facts on which a recognized legal claim could be based." *Id.* (citation omitted). The Court cannot "conjure facts [Plaintiff] might conceivably raise in support of his claims." *Id.* Although Plaintiff complains that he was required to omit much information in support of his claims, *see Response* [#40] at 9, when he was directed to file a more concise complaint, *see Order* [#12], Plaintiff is not excused from provided the level of detail required to demonstrate plausible claims. Regardless, given the level of detail that Plaintiff has here already provided, and given the "conceivable" nature of his Eighth Amendment claims, the Court will recommend at the conclusion of this Recommendation on the Motion to Dismiss [#32] that Plaintiff be permitted to amend his Eighth Amendment claims to provide additional information, specified below, which would help the Court to better evaluate whether the circumstances underlying Plaintiff's claims can be nudged "across the line" from "conceivable" to "plausible."

Turning to the merits of the claims as currently presented by Plaintiff, "[i]t is incumbent on the incarcerating body to provide the individual with a healthy habilitative environment." *Battle v. Anderson*, 564 F.2d 388, 391-92 (10th Cir. 1977). "This includes providing nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Ramos v. Lamm*, 639 F.2d 559, 570-71 (10th Cir. 1980); *see also Barney v. Pulsipher*, 143 F.3d 1299, 1310 (10th Cir. 1998) (stating that "adequate food" is a "basic

necessit[y]"). "A substantial deprivation of food may be sufficiently serious to state a conditions of confinement claim under the Eighth Amendment." *Thompson v. Gibson*, 289 F.3d 1218, 1222 (10th Cir. 2002); *see also Trujillo v. Williams*, 465 F.3d 1210, 1227 (10th Cir. 2006) (stating that "[p]rison officials must ensure inmates receive the basic necessities of [nutritionally] adequate food" (internal quotation marks omitted)); *see also Williams v. Schueler*, 436 F. App'x 687, 689 (7th Cir. 2011) ("Withholding food from prisoners is a deprivation of a basic need that in some circumstances will satisfy the objective aspect of the *Farmer* test."). "To state a claim for food deprivation, a prisoner must allege both (1) a 'sufficiently serious' deprivation of 'the minimal civilized measure of life's necessities' and (2) 'deliberate indifference' by prison officials to a 'substantial risk of serious harm to an inmate.'" *Strope v. Sebelius*, 189 F. App'x 763, 766 (10th Cir. 2006) (quoting *Barney*, 143 F.3d at 1310).

Plaintiff's Eighth Amendment claim may also be characterized as asserting deliberate indifference to a serious medical need, i.e., a failure to help him manage his celiac disease. *See Second Am. Compl.* [#13] at 17-18. "A prison official's deliberate indifference to an inmate's serious medical needs is a violation of the Eighth Amendment's prohibition against cruel and unusual punishment." *Gray v. Geo Grp., Inc.*, 727 F. App'x 940, 943 (10th Cir. 2018) (quoting *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005)). "[A] medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Gray*, 727 F. App'x at 943 (quoting *Mata*, 427 F.3d at 751 (internal quotation marks omitted)). However, regardless of how Plaintiff's Eighth Amendment claim here is framed, the same substantive standard governs both

conditions-of-confinement claims as well as medical-care claims. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). "The test for a deliberate indifference claim has both objective and subjective components." *Gray*, 727 F. App'x at 943 (citing *Mata*, 427 F.3d at 751).

### a. Objective Component

With respect to the objective component, "the test is met if the harm suffered rises to a level 'sufficiently serious' to be cognizable under the Cruel and Unusual Punishment Clause' of the Eighth Amendment." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). "[I]t is the harm claimed by the prisoner that must be sufficiently serious to satisfy the objective component, and not solely 'the symptoms presented at the time the prison employee had contact with the prisoner.'" *Id.* (quoting *Mata v. Saiz*, 427 F.3d 745, 752-53 (10th Cir. 2005)).

As a preliminary matter, Defendants argue that the Court should read the allegations in Plaintiff's Second Amended Complaint to mean that Plaintiff missed one meal a day rather than all meals in a given day. *See Reply* [#41] at 5 ("But Plaintiff simply alleges that on a particular day, a particular Defendant did not feed him. On any particular day, Plaintiff may receive multiple meals, and his allegations do not claim that a particular Defendant denied all meals on a particular day to Plaintiff. Thus, although Plaintiff . . . alleges that, for example, he missed a meal because of a particular Defendant, he may have been able to eat another meal on that day and, thus, Plaintiff would still have nutritionally adequate food." (internal citation omitted)). The Court acknowledges that interpretation of the Second Amended Complaint on this point is a close call. However, the Court must construe all of the well-pled allegations in the Second Amended Complaint in favor of Plaintiff. *See Barnes*, 783 F.3d at 1191-92. Thus, because the allegations may be easily

read to mean that Plaintiff was denied all food on a given day by a given Defendant, the Court construes the allegations in that way as the most favorable interpretation to Plaintiff. For example, when Plaintiff states that, "[o]n the following dates, [Defendant] Pena failed to provide food for [Plaintiff]: 1/17/17, 2/20/17, 3/25/17, 4/7/17, 6/4/17 and 7/4/17," the Court construes this allegation to mean that Plaintiff was provided no food on those days.[15] *Second Am. Compl.* [#13] at 24.

However, even with this construction, Plaintiff's claims fail as to many Defendants. "Courts consider the amount and the duration of the deprivation of food" when determining whether an Eighth Amendment violation has occurred. *Lockamy v. Rodriguez*, 402 F. App'x 950, 951 (5th Cir. 2010). The Seventh Circuit determined in *Williams v. Schueler*, 436 F. App'x at 688-90, that a plausible claim for deliberate indifference was stated where a prisoner was not fed for two full days in a row. The Eighth Circuit has gone even further, holding in *Simmons v. Cook*, 154 F.3d 805, 808 (8th Cir. 1998), that the denial of four meals in a row meets this standard. In *Atkins v. City of Chicago*, 631 F.3d 823, 830 (7th Cir. 2011), the court held that denying food to a prisoner for four days in a row was a "constitutionally significant hardship." In *Foster v. Runnels*, 554 F.3d 807, 812-13 (9th Cir. 2009), the court held that denying a prisoner 16 meals in 23 days (i.e., about 23.1% of meals during that period) was sufficient to demonstrate deliberate indifference. In *Reed v. McBride*, 178 F.3d 849, 853-54 (7th Cir. 1999), the Court held that denying a prisoner food for 3-5 days met this standard. In *Cooper v. Sheriff, Lubbock County, Texas*, 929 F.2d 1078 (5th Cir. 1991), the court determined that prison officials refusing to feed an inmate

---

[15] Of course, it remains to be seen whether the evidence will bear out these allegations and this favorable interpretation.

any food for 12 consecutive days certainly met the deliberate indifference standard.

On the other side of the coin, in *Morris v. Kingston*, No. 07-C-295, 2009 WL 10699611, at *6 (E.D. Wis. Sept. 3, 2009), the court held that missing 17 meals in 24 days (i.e., about 23.6% of meals during that period) did not meet the standard in the absence of other cognizable injury.  In *Berry v. Brady*, 192 F.3d 504, 506-08 (5th Cir. 1999), the court held that denying a prisoner 8 meals in 7 months (i.e. about 3.8% of meals during that period) did not meet the deliberate indifference standard.  In *Vitalis v. Sterling*, No. 0:15-1053-PMD-PJG, 2015 WL 3767292, at *3 (D.S.C. June 17, 2015), the court held that denying prisoners a third meal on each weekend day based on a regular "weekend brunch schedule" was insufficient to demonstrate cruel and unusual punishment.  In *Talib v. Gilley*, 138 F.3d 211, 214 n.3 (5th Cir. 1998), the court noted that it was "doubtful" that denying a prisoner 50 meals in 5 months (i.e., about 11.1% of meals during that period) would meet the deliberate indifference standard.  The court commented: "Missing a mere one out of every nine meals is hardly more than that missed by many working citizens over the same period."  *Talib*, 138 F.3d at 214 n.3.  In *Green v. Ferrell*, 801 F.2d 765, 770-71 (5th Cir. 1986), the court stated that two meals a day may be adequate on a regular, permanent basis.  In *Brzowski v. Illinois Department of Corrections*, No. 15-CV-173-SMY, 2015 WL 1228916, at *4 (S.D. Ill. Mar. 16, 2015), the court held that a two-meal per day system was not per se deliberately indifferent.  In *Hernandez v. Santa Rosa Correctional Institution*, No. 3:05CV39/MCR/EMT, 2006 WL 1494008, at *4 (N.D. Fla. May 24, 2006), the court held that missing lunch five times a week for four months (i.e., about 23.8% of meals during that period) was insufficient to meet the standard in the absence of adverse health consequences.  In *Gardner v. Beale*, 780 F. Supp. 1073, 1075 (E.D. Va. 1991), the Court

held that a two-meal per day system, even with an 18-hour interval between dinner and brunch, was insufficient to meet the deliberate indifference standard.  In *Cunningham v. Jones*, 667 F.2d 565, 566 (6th Cir. 1982), the court held that missing one meal per day for 15 days (i.e., 33% of meals) did not violate the Eighth Amendment where the two remaining meals provided sufficient nutrition to sustain normal health.  In *Lockamy v. Rodriguez*, 402 F. App'x at 951, the court held that missing every meal over the course of 54 hours was insufficient to state a claim in the absence of cognizable injury.

"[T]he need for a special diet that is medically necessary could be the objective basis for a claim . . . ."  *Thompson*, 289 F.3d at 1222.  Plaintiff alleges that on September 3, 2013, FPC medical staff "issued orders to the FPC Food Service Department that [Plaintiff] was to receive a gluten-free diet INDEFINITELY for medical reasons."  *Second Am. Compl.* [#13] at 5 (emphasis in original).  This restriction continued throughout the duration of the events underlying this lawsuit.  *Id.* at 15 (stating that in March 2017 a renewed directive was sent to "food service" stating: "Inmate is authorized to have gluten-free diet indefinitely for medical reason.").  Thus, it is clear that Plaintiff was diagnosed by medical staff as "mandating treatment," i.e., a special diet due to celiac disease, although there is no indication that this "medical staff" included a physician.  *Gray*, 727 F. App'x at 943 ("[A] medical need is sufficiently serious if it is one that has been *diagnosed by a physician* as mandating treatment . . . ." (emphasis added); *Thompson*, 289 F.3d at 1222.

In the context of religion, the Tenth Circuit Court of Appeals has held that a claim *may* have been stated where prisoners on a kosher diet were routinely served spoiled food, thus leaving them with an inadequate diet, and where prison officials were deliberately

indifferent to that problem.[16]  *Strope*, 189 F. App'x at 766.  Plaintiff alleges much the same, i.e., that prisoners on a gluten-free diet were routinely served food that was expired, contaminated, or exposed to bacteria, thus leaving them with an inadequate diet.  *See, e.g.*, *Second Am. Compl.* [#13] at 22-24.  Although the Court agrees with Defendants that many allegations in the Second Amended Complaint referring to this point are conclusory, *see Motion* [#32] at 16-18, the Court finds that Plaintiff has pled enough at this early stage of the litigation to meet the objective component.  There is no indication that Plaintiff ate these expired, contaminated, or exposed foods,[17] and thus, there is no indication that he suffered any injury from them directly; however, his injury comes from not being provided sufficient and nutritionally adequate food which he could medically eat, thus allegedly causing a host of problems, including, for example, sigmoid diverticulosis, extreme constipation, stomach issues, and extended hunger over a span of multiple years. *Second Am. Compl.* [#13] at 12.

In short, the Court finds that Plaintiff has met the objective portion of the deliberate indifference test.

### b.    Subjective Component

Prison officials cannot "absolutely guarantee the safety of their prisoners."  *Cox v.*

---

[16]  The Court of Appeals declined to decide unequivocally whether such allegations stated a claim, instead remanding the case for further proceedings.  *Strope*, 189 F. App'x at 766.

[17]  Plaintiff conclusorily states once that he and the other gluten-free inmate "got sick from consuming tainted foods," but there is no indication of how they were tainted.  *Second Am. Compl.* [#1-1] at 14.  The attachment to the Second Amended Complaint to which he cites merely states that, "[o]n Feb 7, 2017, CO Versaw did not prepare any food for lunch for the Gluten Free inmates, so he served left over Arby's meat and rice from the dinner the night before.  Both Gluten Free inmates got sick from eating this Arby's meat soaked in some kind of gravy."  *Pl.'s Ex. 39* [#1-1] at 47.  Nothing here indicates that the leftovers had been expired, contaminated, or exposed in such a way as to cause Plaintiff to become ill.

*Glanz*, 800 F.3d 1231, 1247-48 (10th Cir. 2015) (quoting *Lopez v. LeMaster*, 172 F.3d 756, 759 (10th Cir. 1999)). Regardless, they "ha[ve] a constitutional duty to take reasonable steps to protect the prisoners' safety and bodily integrity." *Cox*, 800 F.3d at 1248 (quoting *Berry v. City of Muskogee*, 900 F.2d 1489, 1499 (10th Cir. 1990)). "The subjective component of the deliberate indifference test requires that the plaintiff present evidence of the prison official's culpable state of mind and is met by showing that the defendant knew the plaintiff faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Gray*, 727 F. App'x at 943 (internal citations and quotation marks omitted). Allegations that the defendants were negligent do not meet this standard. *Id.* (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "[A] prison official cannot be liable unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006) (internal quotation marks omitted).

Generally, with the exception of Defendant Ruda, allegations are lacking in the Second Amended Complaint [#13] that any one Defendant knew that any other Defendant was depriving Plaintiff of meals/nutrition. Therefore, the question becomes whether what each Defendant knew was enough to put that particular Defendant on notice that his or her actions (or inactions) were creating a substantial risk of serious harm to Plaintiff's health or safety.

The Court notes at the outset here that Plaintiff's allegations of repeatedly telling "staff" about his need for gluten-free foods and the long-term effects on his health are too conclusory, given that there are allegations that the staff, with the exception of Defendant

Ruda, frequently rotated, and that there are no allegations regarding which specific staff members were on duty whenever he provided this information to them. *See, e.g.*, *Second Am. Compl.* [#13] at 9, 13 (citing *Pl.'s Ex. 35* [#1-1] at 43), 16 (citing *Pl.'s Ex. 46* [#1-1] at 59).

### i. Defendant Harrison

The allegations regarding Defendant Harrison are as follows. Plaintiff stated in an Inmate Request dated March 14, 2016, that Defendant Harrison "has refused to feed me a Gluten free diet" and "has refused to follow the national Gluten free menu." *Id.* at 12-13 (citing *Ex. 32* [#1-1] at 40). On March 10, 2017, Defendant Harrison allegedly told Plaintiff that Defendant Ruda "told her not to feed the Gluten-Free inmates, as she does not have any paperwork proving that they are in fact Gluten Free." *Second Am. Compl.* [#13] at 15. Plaintiff alleges that on 24 specific dates between September 30, 2016, and July 4, 2017, Defendant Harrison failed to provide food to Plaintiff, and on 6 dates between November 17, 2016, and June 10, 2017, she provided food to him that she knew contained gluten. *Second Am. Compl.* [#13] at 22-23. On at least three occasions, Plaintiff alleges that Defendant Harrison failed to feed him for two consecutive days in a row. *See id.* (listing December 7-8, 2016; January 5-6, 2017; January 11-12, 2017). Plaintiff conclusorily states that Defendant Harrison "provided less than 50% of the calories, Fat, Protein, Carbs and Fiber provided to every other inmate," and that she "served food knowing that the food contained Gluten, that the food was expired, contaminated and / or exposed to bacteria." *Id.* at 22.

The Court begins with the allegation that Defendant Harrison failed to feed Plaintiff for two days in a row, three times. *Second Am. Compl.* [#13] at 22-23 (listing December

7-8, 2016; January 5-6, 2017; January 11-12, 2017).  The Seventh Circuit determined in *Williams v. Schueler*, 436 F. App'x at 688-90, that a plausible claim for deliberate indifference is stated where a prisoner is not fed for two full days in a row, and the Eighth Circuit in *Simmons v. Cook*, 154 F.3d at 808, determined that four meals in a row meets this standard.  It is also clear that, if Defendant Harrison herself refused food to Plaintiff for two days in a row, that she must have been aware of that fact.  The Court therefore finds that Plaintiff has plausibly stated an Eighth Amendment claim against her on this basis.

Regarding meals over the long-term, the allegations state that Defendant Harrison failed to feed Plaintiff 24 days in a 278-day period from September 16, 2016, to July 4, 2017, or about 8.6% of his meals.  Adding the 6 days on which Defendant Harrison allegedly provided Plaintiff with grossly inadequate meals, the percentage rises to about 10.8%.  These numbers simply are not high enough to meet the deliberate indifference standard enunciated by other courts.  *See, e.g.*, *Talib*, 138 F.3d at 214 n.3 (noting that it was "doubtful" that denying a prisoner about 11.1% of meals over the course of 5 months would meet the deliberate indifference standard); *Hernandez*, 2006 WL 1494008, at *4 (noting that missing about 23.8% of meals over the course of four months was insufficient in the absent of adverse health consequences).

In the absence of allegations demonstrating that Defendant Harrison failed to feed Plaintiff such an extraordinarily high number of times that it could automatically be inferred that she was aware a substantial risk of serious harm existed to Plaintiff's health, the Court must look to Plaintiff's specific allegations to determine whether he has shown that Defendant Harrison "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and that she also drew that inference.  *See*

*Self*, 439 F.3d at 1231.  However, there is no allegation regarding when, if ever, Plaintiff informed Defendant Harrison of his need for gluten-free food.  There are no allegations regarding whether (and if so, when) Plaintiff ever told Defendant Harrison anything about how his health was being affected.  There are no allegations that Defendant Harrison knew that other staff members were not feeding or were inadequately feeding Plaintiff.  There are no allegations that Defendant Harrison knew that the food she provided to Plaintiff allegedly contained gluten or was "expired, contaminated and / or exposed to bacteria."  *See Second Am. Compl.* [#13] at 22.  There are no allegations that, if Plaintiff did eat the food provided to him by Defendant Harrison, whether that food in particular actually made him sick and that he informed her of that fact.  A complaint simply does not suffice "if it tenders naked assertions devoid of further factual enhancement."  *Iqbal*, 556 U.S. at 678 (internal alterations omitted).  Plaintiff has simply not provided the requisite minimum amount of "factual enhancement" to meet the subjective component of this portion of his deliberate indifference claim.

Accordingly, the Court **recommends** that this claim be **dismissed without prejudice** as to Defendant Harrison in her official capacity **except** to the extent Plaintiff has alleged Defendant Harrison failed to feed him for two days in a row on three separate occasions.

### ii.    Defendant Thomas

The allegations regarding Defendant Thomas are as follows.  Plaintiff alleges that on April 7, 2016, he filed a "Trulincs Request" with Defendant Ruda "concerning an [sic] verbal attack upon [Plaintiff] by CO Thomas and inmate staff Jeanetta."  *Id.* at 13.  In that

request, he stated:

> On April 5th, 2016, CO Thomas was working. When I approached I asked if I could eat the meatloaf. CO Thomas, did not know. She asked the inmate serving, he stated yes, then she asked if they followed the menu and prepared the meal with bread crumbs, in which he responded yes. Then then [sic] called lead cook Jeanetta forward, and asked him. He responded that [Plaintiff] could eat the meatloaf. She then asked him if he placed bread crumbs into the meatloaf, in which he responded with a yes. He states that he feeds [Plaintiff] bread in his meals all the time. I then respond that he has time and time again worked to cause me pain, and to stop.
>
> CO Thomas then requests that Jeanetta to get [sic] [Plaintiff] bread and peanut butter as his meal. Jeanetta then states that [Plaintiff] does not eat his bread. I then tell him that I do eat the bread everyday. Jeanette [sic] then begins to yell obscenities at me. Jeanetta then crumbles Lovett's bread. He can not find peanut butter, and continues to belittle [Plaintiff]. [Plaintiff] turns and walks away. CO Thomas calls [Plaintiff] back, as she has found peanut butter in a lunch bag. I take the peanut butter . . . .

*Pl.'s Ex. 34* [#1-1] at 42. Plaintiff alleges that on 9 specific dates between October 2, 2016, and January 4, 2017, Defendant Thomas failed to provide food to Plaintiff. *Id.* at 23. Plaintiff states that on October 3, 2016, Defendant Thomas "refused to provide food to the Gluten Free inmates[,] stating that they can eat bread and water only." *Id.* On at least two occasions, Plaintiff alleges that Defendant Thomas failed to feed him for two consecutive days in a row. *See id.* (listing October 2-3, 2016, and November 26-27, 2016). Plaintiff also conclusorily states that Defendant Thomas "provided less than 50% of the calories, fats, proteins, carbs and fiber provided to every other inmate" and that she "served food knowing that the food contained gluten, was contaminated and /or expired, or may contain bacteria." *Id.*

The Court begins with the allegation that Defendant Thomas failed to feed Plaintiff for two days in a row, two times. *Second Am. Compl.* [#13] at 23 (listing October 2-3, 2016, and November 26-27, 2016). The Seventh Circuit determined in *Williams*, 436 F. App'x at

688-90, that a plausible claim for deliberate indifference is stated where a prisoner is not fed for two full days in a row, and the Eighth Circuit in *Simmons*, 154 F.3d at 808, determined that four meals in a row meets this standard. It is also clear that, if Defendant Thomas herself did not feed Plaintiff for two days in a row, as he alleges, that she must have been aware of that fact. The Court therefore finds that Plaintiff has plausibly stated an Eighth Amendment claim on this basis.

Regarding meals over the long-term, the allegations state that Defendant Thomas failed to feed Plaintiff 9 days in a 94-day period from October 2, 2016, to January 4, 2017, or about 9.6% of his meals. Adding the 1 day on which Defendant Thomas allegedly provided Plaintiff with grossly inadequate food, the number rises to about 10.6%. These numbers simply are not high enough to meet the deliberate indifference standard enunciated by other courts. *See, e.g.*, *Talib*, 138 F.3d at 214 n.3 (noting that it was "doubtful" that denying a prisoner about 11.1% of meals over the course of 5 months would meet the deliberate indifference standard); *Hernandez*, 2006 WL 1494008, at *4 (noting that missing about 23.8% of meals over the course of four months was insufficient in the absent of adverse health consequences).

In the absence of allegations demonstrating that Defendant Thomas failed to feed Plaintiff such an extraordinarily high number of times that it could automatically be inferred that she was aware a substantial risk of serious harm existed to Plaintiff's health, the Court must look to Plaintiff's specific allegations to determine whether he has shown that Defendant Thomas "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and that she also drew that inference. *See Self*, 439 F.3d at 1231. However, there is no allegation regarding when, if ever, Plaintiff

informed Defendant Thomas of his need for gluten-free food, although the fact that he told her at some unidentified point could be inferred, at least, from Plaintiff's April 5, 2016 interaction with her and lead cook Jeanetta, discussed above. There are no allegations regarding whether (and if so, when) Plaintiff ever told Defendant Thomas anything about how his health was being affected. There are no allegations that Defendant Thomas knew that other staff members were not feeding or were inadequately feeding Plaintiff. There are no allegations that Defendant Thomas knew that the food she provided to Plaintiff allegedly contained gluten or was expired, contaminated, or exposed to bacteria. *See Second Am. Compl.* [#13] at 23. There are no allegations that, if Plaintiff did eat the food provided to him by Defendant Thomas, whether that food in particular actually made him sick and that he informed her of that fact. A complaint simply does not suffice "if it tenders naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (internal alterations omitted). Plaintiff has simply not provided the requisite minimum amount of "factual enhancement" to meet the subjective component of a deliberate indifference claim.

Accordingly, the Court **recommends** that this claim be **dismissed without prejudice** as to Defendant Thomas in her official capacity **except** to the extent Plaintiff has alleged Defendant Thomas failed to feed him for two days in a row on two separate occasions.

### iii.    Defendant McClendon

The allegations regarding Defendant McClendon are as follows. Plaintiff alleges that on February 8, 2017, he wrote a letter to Warden Getz and the Food Service Supervisor "explaining the lack of food and the actions of CO McClennon [sic]." *Second Am. Compl.*

[#1-1] at 47.  In the letter, he wrote, in part:

> On Feb 4, 2017, CO McC_____ served sausage [as] an [sic] replacement meal from the national menu.  At this meal we received very little calorie content.  At this evening meal, very little camp inmates attended dinner, as it was posted to be hot dogs.  Over 25 men lined up in hopes of receiving the extra leftover food, but were turned away, only to watch as CO McC_____ gave 100 plus extra sausages to her staff, and then allowed only the black inmates to come forward to receive extra food.  McC_____ was also witnessed taking large sums of food home with her.

*Pl.'s Ex. 39* [#1-1] at 47.  Plaintiff alleges that on sixteen specific dates between December 30, 2016, and June 7, 2017, Defendant McClendon failed to provide food to Plaintiff. *Second Am. Compl.* [#13] at 23.  On at least three occasions, Defendant McClendon allegedly failed to provide food to Plaintiff for two days in a row.  *Id.* (listing December 30-31, 2016; January 8-9, 2017; and January 29-30, 2017).  Plaintiff also conclusorily states that Defendant McClendon "provided less than 50% of the calories, fats, proteins, carbs and fiber provided to every other inmate" and that she "served food knowing that the food contained Gluten, that the food was expired, contaminated and / or exposed to bacteria." *Id.*

The Court begins with the allegation that Defendant McClendon failed to feed Plaintiff for two days in a row, three times.  *Second Am. Compl.* [#13] at 23 (listing December 30-31, 2016; January 8-9, 2017; and January 29-30, 2017).  The Seventh Circuit determined in *Williams*, 436 F. App'x at 688-90, that a plausible claim for deliberate indifference is stated where a prisoner is not fed for two full days in a row, and the Eighth Circuit in *Simmons*, 154 F.3d at 808, determined that four meals in a row meets this standard.  It is also clear that, if Defendant McClendon herself did not feed Plaintiff for two days in a row, that she must have been aware of that fact.  The Court therefore finds that

Plaintiff has plausibly stated an Eighth Amendment claim on this basis.

Regarding meals over the long-term, the allegations state that Defendant McClendon failed to feed Plaintiff 16 days in a 160-day period from December 30, 2016, to June 7, 2017, or about 5.6% of his meals. This number is simply not high enough to meet the deliberate indifference standard enunciated by other courts. *See, e.g.*, *Talib*, 138 F.3d at 214 n.3 (noting that it was "doubtful" that denying a prisoner about 11.1% of meals over the course of 5 months would meet the deliberate indifference standard); *Hernandez*, 2006 WL 1494008, at *4 (noting that missing about 23.8% of meals over the course of four months was insufficient in the absent of adverse health consequences).

In the absence of allegations demonstrating that Defendant McClendon failed to feed Plaintiff such an extraordinarily high number of times that it could automatically be inferred that she was aware a substantial risk of serious harm existed to Plaintiff's health, the Court must look to Plaintiff's specific allegations to determine whether he has shown that Defendant McClendon "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and that she also drew that inference. *See Self*, 439 F.3d at 1231. However, there is no allegation regarding when, if ever, Plaintiff informed Defendant McClendon of his need for gluten-free food. There are no allegations regarding whether (and if so, when) Plaintiff ever told Defendant McClendon anything about how his health was being affected. There are no allegations that Defendant McClendon knew that other staff members were not feeding or were inadequately feeding Plaintiff. There are no allegations that Defendant McClendon knew that the food she provided to Plaintiff allegedly contained gluten or was expired, contaminated, or exposed to bacteria. *See Second Am. Compl.* [#13] at 23. There are no allegations that, if Plaintiff

did eat the food provided to him by Defendant McClendon, whether that food in particular actually made him sick and that he informed her of that fact. A complaint simply does not suffice "if it tenders naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (internal alterations omitted). Plaintiff has simply not provided the requisite minimum amount of "factual enhancement" to meet the subjective component of a deliberate indifference claim.

Accordingly, the Court **recommends** that this claim be **dismissed without prejudice** as to Defendant McClendon in her official capacity **except** to the extent Plaintiff has alleged Defendant McClendon failed to feed him for two days in a row on three separate occasions.

### iv. Defendant Versaw

The allegations regarding Defendant Versaw are as follows. Plaintiff alleges that on February 8, 2017, he wrote a letter to Warden Getz and the Food Service Supervisor "explaining the lack of food and the actions of . . . CO Versaw." *Second Am. Compl.* [#1-1] at 47. In the letter, he wrote, in part:

> On Feb 5, 2017, SuperBowl [sic] Sunday, CO Versaw only served the Gluten Free inamtes [sic] 2 boiled eggs for lunch, with a white styroforam [sic] with salsa and peanutbutter [sic] mixed together, which of course are not eatible [sic]. So we received no food at all for lunch or dinner.

> On Feb 6, 2017, CO Versaw refused to allow the Gluten Free inmates to receive french fries, now stating that it was not on the gluten free menu, only a plain white potato. He now states that we can't have french fries, even though we have been served these same french fries over 200 times in the past 4 years.

> On Feb 7, 2017, CO Versaw did not prepare any food for lunch for the Gluten Free inmates, so he served left over Arby's meat and rice from the dinner the night before. Both Gluten Free inmates got sick from eating this Arby's meat

soaked in some kind of gravy.

*Pl.'s Ex. 39* [#1-1] at 47. Plaintiff alleges that on seventeen specific dates between October 22, 2016, and March 6, 2017, Defendant Versaw failed to provide food to Plaintiff. *Second Am. Compl.* [#13] at 23. On at least four occasions, Defendant Versaw failed to feed Plaintiff for two days in a row. *Id.* (listing December 24-25, 2016; December 27-28, 2016; February 5-6, 2017; February 27-28, 2017). Plaintiff further alleges that on eight specific dates between December 24, 2016, and March 6, 2017, Defendant Versaw "knowingly contaminated [Plaintiff's] food by placing the exposed food under his crotch, under the serving counter, and made humiliating comments to [Plaintiff] about his nasty food." *Id.* Plaintiff also conclusorily states that Defendant Versaw "provided less than 50% of the calories, fat, protein, carbs and fiber provided to every other inmate" and "served food knowing that the food contained Gluten, that the food was expired, contaminated and / or exposed to bacteria." *Id.*

The Court begins with the allegation that Defendant Versaw failed to feed Plaintiff for two days in a row, four times. *Second Am. Compl.* [#13] at 23 (listing December 24-25, 2016; December 27-28, 2016; February 5-6, 2017; February 27-28, 2017). The Seventh Circuit determined in *Williams*, 436 F. App'x at 688-90, that a plausible claim for deliberate indifference is stated where a prisoner is not fed for two full days in a row, and the Eighth Circuit in *Simmons*, 154 F.3d at 808, determined that four meals in a row meets this standard. It is also clear that, if Defendant Versaw himself did not feed Plaintiff for two days in a row, that he must have been aware of that fact. The Court therefore finds that Plaintiff has plausibly stated an Eighth Amendment claim on this basis.

Regarding meals over the long-term, the allegations state that Defendant Versaw

failed to feed Plaintiff 17 days in a 135-day period from October 22, 2016, to March 6, 2017, or about 11.0% of his meals. Adding the 8 days on which Defendant Harrison allegedly provided Plaintiff with grossly inadequate meals, that number rises to about 18.5%. These numbers simply are not high enough to meet the deliberate indifference standard enunciated by other courts. *See, e.g.*, *Morris*, 2009 WL 10699611, at *6 (holding that missing about 23.6% of meals in 24 days did not meet the standard in the absence of other cognizable injury); *Hernandez*, 2006 WL 1494008, at *4 (noting that missing about 23.8% of meals over the course of four months was insufficient in the absent of adverse health consequences).

In the absence of allegations demonstrating that Defendant Versaw failed to feed Plaintiff such an extraordinarily high number of times that it could automatically be inferred that he was aware a substantial risk of serious harm existed to Plaintiff's health, the Court must look to Plaintiff's specific allegations to determine whether he has shown that Defendant Versaw "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and that he also drew that inference. *See Self*, 439 F.3d at 1231. However, there is no allegation regarding when Plaintiff informed Defendant Versaw of his need for gluten-free food, although the fact that he did so at some unidentified point can be inferred from Plaintiff's statement that on February 6, 2017, Defendant Versaw had a discussion with Plaintiff about what food was supposedly listed on the gluten-free menu. *Pl.'s Ex. 39* [#1-1] at 47. There are no allegations regarding whether (and if so, when) Plaintiff ever told Defendant Versaw anything about how his health was being affected. There are no allegations that Defendant Versaw knew that other staff members were not feeding or were inadequately feeding Plaintiff. There are no

allegations that Defendant Versaw knew that the food he provided to Plaintiff allegedly contained gluten or was expired, contaminated, or exposed to bacteria. *See Second Am. Compl.* [#13] at 23. There is only one allegation that food provided by Defendant Versaw (the Arby's meat on February 7, 2017) ever made Plaintiff sick, but, as mentioned previously, there are no allegations that the meat was contaminated in any particular way or that Plaintiff informed Defendant Versaw that he got sick from the meat. *See Pl.'s Ex. 39* [#1-1] at 47. Finally, although abhorrent, in the absence of further allegations, the Court is constrained against finding that Defendant's Versaw alleged actions on eight occasions between December 24, 2016, and March 6, 2017, of "placing the exposed food under his crotch, under the serving counter" and making "humiliating comments to [Plaintiff] about his nasty food" constitute facts showing that a known "substantial risk of serious harm" existed. *See Self*, 439 F.3d at 1231. A complaint simply does not suffice "if it tenders naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (internal alterations omitted). Plaintiff has simply not provided the requisite minimum amount of "factual enhancement" to meet the subjective component of a deliberate indifference claim.

Accordingly, the Court **recommends** that this claim be **dismissed without prejudice** as to Defendant Versaw in his official capacity **except** to the extent Plaintiff has alleged Defendant Versaw failed to feed him for two days in a row on four separate occasions.

### v.    Defendant Pena

The allegations regarding Defendant Pena are as follows. Plaintiff alleges that on six specific dates between January 17, 2017, and July 4, 2017, Defendant Pena failed to

provide food to him. *Second Am. Compl.* [#13] at 24. He further alleges that on four specific dates between March 13, 2017, and July 7, 2017, Defendant Pena "subjected [Plaintiff] to humiliation with his comments concerning the gluten-free inmates." *Id.* Plaintiff also conclusorily states that Defendant Pena "provided less than 50% of the calories, fat, protein, carbs and fiber provided to every other inmate" and "served food knowing that the food contained Gluten, that the food was expired, contaminated and / or exposed to bacteria." *Id.*

Plaintiff does not allege that Defendant Pena ever failed to feed him for two or more days in a row, so that is not an issue as to this Defendant. Regarding meals over the long-term, the allegations state that Defendant Pena failed to feed Plaintiff 6 days in a 168-day period from January 17 to July 4, 2017, or about 4.6% of his meals. This number is simply not high enough to meet the deliberate indifference standard enunciated by other courts. *See, e.g.*, *Talib*, 138 F.3d at 214 n.3 (noting that it was "doubtful" that denying a prisoner about 11.1% of meals over the course of 5 months would meet the deliberate indifference standard); *Hernandez*, 2006 WL 1494008, at *4 (noting that missing about 23.8% of meals over the course of four months was insufficient in the absent of adverse health consequences).

In the absence of allegations demonstrating that Defendant Pena failed to feed Plaintiff such an extraordinarily high number of times that it could automatically be inferred that he was aware a substantial risk of serious harm existed to Plaintiff's health, the Court must look to Plaintiff's specific allegations to determine whether he has shown that Defendant Pena "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and that he also drew that inference. *See Self*,

439 F.3d at 1231. However, there is no allegation regarding when Plaintiff informed Defendant Pena of his need for gluten-free food, although the fact that he did so at some unidentified point can be inferred from Plaintiff's statement that Defendant Pena subjected him to "humiliation with his comments concerning the gluten-free inmates" on four separate occasions starting on March 13, 2017. *Second Am. Compl.* [#13] at 24. There are no allegations regarding whether (and if so, when) Plaintiff ever told Defendant Pena anything about how his health was being affected. There are no allegations that Defendant Pena knew that other staff members were not feeding or were inadequately feeding Plaintiff. There are no allegations that Defendant Pena knew that the food he provided to Plaintiff allegedly contained gluten or was expired, contaminated, or exposed to bacteria. *See Second Am. Compl.* [#13] at 23. There are no allegations that, if Plaintiff did eat the food provided to him by Defendant , whether that food in particular actually made him sick and that he informed him of that fact. A complaint simply does not suffice "if it tenders naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (internal alterations omitted). Plaintiff has simply not provided the requisite minimum amount of "factual enhancement" to meet the subjective component of a deliberate indifference claim.

Accordingly, the Court **recommends** that this claim be **dismissed without prejudice** as to Defendant Pena in his official capacity.

### vi.    Defendant Boling

As stated above in Section III.D., Plaintiff's Eighth Amendment deliberate indifference claim against Defendant Boling preliminarily survives only to the extent that this claim is based on Plaintiff's purported sigmoid diverticulosis injury, which was medically

diagnosed in late August 2015, because the remainder of this claim against Defendant Boling is barred by the statute of limitations. *See Second Am. Compl.* [#13] at 10-11.

The allegations regarding Defendant Boling are as follows. Plaintiff alleges that on February 28, 2015, he wrote a Trulincs Request "concerning the lack of food, and the fact that CO Boiling [sic] refuses to feed [Plaintiff], and that [Plaintiff] is being tormented, ridiculed and verbally harrassed [sic] by the CO Boiling [sic]." *Id.* at 7 (citing *Pl.'s Ex. 9* [#1-1] at 15). On March 6, 2015, Plaintiff wrote a Trulincs Request "concerning the continued lack of food due to CO Boiling [sic] refusal to feed the Gluten Free inmates." *Second Am. Compl.* [#13] at 7 (citing *Pl.'s Ex. 10* [#1-1] at 16). On March 13, 2015, Plaintiff wrote a Trulincs Request "concerning the on-going refusal of Boiling [sic] to feed [Plaintiff] for over 1 week." *Second Am. Compl.* [#13] at 7 (citing *Pl.'s Ex. 11* [#1-1] at 17). Plaintiff alleges that from February 15-28 and March 2-13, 2015, Defendant Boling "refused to provide food" to Plaintiff and, for most of that period, "directed an [sic] campaign of hate and harassment against" Plaintiff. *Second Am. Compl.* [#13] at 22. Plaintiff also conclusorily states that Defendant Boling "provided less than 50% of the calories, Fat, Protein, Carbs and Fiber provided to every other inmate" and "served food knowing that the food contained Gluten, that the food was expired, contaminated and / or exposed to bacteria." *Id.*

Plaintiff does not need to provide allegations that Defendant Boling was aware that his actions could cause Plaintiff to develop sigmoid diverticulosis specifically, but Plaintiff must provide allegations that Defendant Boling was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]," that he also drew that inference, and that this harm was somehow connected to the type of harm

Plaintiff experienced. *See Self*, 439 F.3d at 1231. In other words, Plaintiff alleges that he has celiac disease and that Defendant Boling's actions in failing to mitigate the impact of that disease caused injury to Plaintiff, which in this situation ultimately turned out to be sigmoid diverticulosis.

However, the Court finds that Plaintiff fails to provide enough allegations to make a showing that Defendant Boling was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed in connection with Plaintiff's celiac disease. There is no allegation regarding when, if ever, Plaintiff informed Defendant Boling of his need for gluten-free food, although this fact can perhaps be inferred from the unspecified "harassment" Defendant Boling allegedly directed at Plaintiff. *Second Am. Compl.* [#13] at 22. There are no allegations regarding whether (and if so, when) Plaintiff ever told Defendant Boling anything about how his health was being affected by the food Defendant Boling was supplying him or how his health could be affected by the failure to comply with a wheat-free diet. There are no allegations that Defendant Boling knew that the food he provided to Plaintiff allegedly contained gluten or that Plaintiff could be harmed if he ate gluten. *See Second Am. Compl.* [#13] at 23. A complaint simply does not suffice "if it tenders naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (internal alterations omitted). Plaintiff has simply not provided the requisite minimum amount of "factual enhancement" to meet the subjective component of a deliberate indifference claim.

Accordingly, the Court **recommends** that this claim be **dismissed without prejudice** as to Defendant Boling in his official capacity.

-45-

### vii.    Defendant Saint

Similarly to Defendant Boling, and as stated above in Section III.D., Plaintiff's Eighth Amendment deliberate indifference claim against Defendant Saint preliminarily survives only to the extent that this claim is based on Plaintiff's purported sigmoid diverticulosis injury, which was medically diagnosed in late August 2015, because the remainder of this claim against Defendant Saint is barred by the statute of limitations.  *See Second Am. Compl.* [#13] at 10-11.

With respect to Defendant Saint, Plaintiff alleges that on October 7, 2014, Defendant Saint "retaliated against [Plaintiff] for filing an [sic] Request to Staff," "tampered with [Plaintiff's] food by adding gluten products," and "made public comments about [Plaintiff] in front of the inmates and the food service staff."  *Id.* at 21; *see also id.* at 6 (describing how Plaintiff was confronted alone by Defendant Saint, how he was upset that Plaintiff wrote him up, and that he "poured wheat (Gluten) soy sauce over [Plaintiff's] food, knowing that it contained" gluten).  On October 8, 2014, Defendant Saint fed him only "corn chips" for dinner.  *Id.* at 6.  On March 29 and April 3, 2015, Defendant Saint "did not provide any food" to Plaintiff.  *Id.* at 21-22; *see also id.* at 8 (stating that on March 29, 2015, Plaintiff wrote a Trulincs Request about Defendant Saint's refusal to feed him and attempt to give him food containing gluten).  On April 6, 2015, he "openly supplied [Plaintiff] with food he knew contained Gluten in an effort to cause [Plaintiff] pain, injury or death."  *Id.* at 22; *see also id.* at 9 (stating that Plaintiff confronted Defendant Saint and demanded to be fed, but Defendant Saint refused).  On April 7, 2015, Plaintiff "was placed into a room alone with Saint and Ruda, at which point [Plaintiff] was threathen [sic] with solidary [sic] confinement if he ever wrote another request to staff concerning his need for food."  *Id.* at 22.

Defendant Saint "then detailed his hatred of [Plaintiff] and his Gluten-Free medical condition," calling Plaintiff "a liar and a bully." *Id.* at 9, 22.

Plaintiff further alleges that from August 2013 to December 13, 2013, Defendant Saint fed him only 156 out of 300 meals, and that "most of these meals did not meet the minimum requirements." *Id.* at 21. Plaintiff further alleges that from November 9-13, 2014, and January 2-5, 2015, Defendant Saint failed to provide food to Plaintiff. *Second Am. Compl.* [#13] at 21. Plaintiff further alleges that on thirteen specific dates between March 29 and July 27, 2015, Plaintiff "became very ill after consuming food" provided by Defendant Saint." *Id.* at 22. Plaintiff also conclusorily states that Defendant Saint "provided less than 50% of the calories, fats, proteins, carbs and fiber provided to every other inmate" and "served food knowing that the food contained gluten, that the food was expired, contaminated and / or exposed to bacteria." *Id.* at 21-22.

Unlike the allegations regarding Defendant Boling, Plaintiff has here provided sufficient allegations to demonstrate that Defendant Saint was aware that his actions could cause Plaintiff to suffer injury by failing to provide Plaintiff with a diet that complies with the needs of those with celiac disease. Plaintiff provides allegations that Defendant Saint was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," that he also drew that inference, and that his actions are somehow connected to the type of harm Plaintiff experienced. *See Self*, 439 F.3d at 1231. In other words, Plaintiff alleges that he has celiac disease and that Defendant Saint's actions in failing to mitigate the impact of that disease caused injury to Plaintiff, which in this situation turned out to be sigmoid diverticulosis.

Plaintiff has clearly alleged that he informed Defendant Saint of his need for gluten-

free food prior to most if not all of Defendant Saint's actions. Plaintiff has clearly alleged that he repeatedly spoke to Defendant Saint about his needs regarding gluten. Plaintiff also clearly alleges that Defendant Saint refused to help and that he actively worked to give gluten to Plaintiff despite knowing about Plaintiff's needs. The Court finds that Plaintiff has provided the requisite minimum amount of "factual enhancement" to meet the subjective component of a deliberate indifference claim here. *See Iqbal*, 556 U.S. at 678 (internal alterations omitted).

Accordingly, the Court **recommends** that the Motion [#32] be **denied** to the extent Defendant Saint in his official capacity seeks dismissal of this claim.

### viii.    Defendant Ruda

As stated above in Section III.D., prior to August 21, 2015, Plaintiff's Eighth Amendment deliberate indifference claim against Defendant Ruda preliminarily survives only to the extent that this claim is based on Plaintiff's purported sigmoid diverticulosis injury, which was medically diagnosed in late August 2015, because the remainder of this claim prior to that date against Defendant Ruda is barred by the statute of limitations. *See Second Am. Compl.* [#13] at 10-11. However, all of Defendant Ruda's actions after that date are not time-barred for purposes of determining whether Plaintiff has sufficiently stated an Eighth Amendment deliberate indifference claim against her.

With respect to Defendant Ruda, Plaintiff alleges that on October 6, 2014, Plaintiff sent her a Trulincs Request "requesting a meeting to go over my continued food problems, request a copy of the BOP Gluten-Free menu, and to find ways to work together to meet the daily requirements." *Second Am. Compl.* [#13] at 6 (citing *Pl.'s Ex. 3* [#1-1] at 9). The

next day, Defendant Ruda "called [Plaintiff] to food service and provided the Gluten-Free menu." *Second Am. Compl.* [#13] at 6.  They "went over his concerns and she agreed to work to find better ways to provide food" for Plaintiff.  *Id.*  On October 8, 2014, Plaintiff sent another Trulincs Request to Defendant Ruda, detailing his interactions with Defendant Saint.  *Id.* (citing *Pl.'s Ex. 4* [#1-1] at 10).  On November 13, 2014, Plaintiff sent her another Trulincs Request "detailing that he has not received any food in 4 days" and "[p]leading with Ruda to find a way to feed" him.  *Second Am. Compl.* [#13] at 7 (citing *Pl.'s Ex. 5* [#1-1] at 11).  On January 3, 2015, he wrote her another Trulincs Request "informing her that [he] was not receiving any food."  *Second Am. Compl.* [#13] at 7 (citing *Pl.'s Ex. 6* [#1-1] at 12).  On January 4, 2015, he wrote her another Trulincs Request "stating that he has not received any food for 2 days."  *Second Am. Compl.* [#13] at 7 (citing *Pl.'s Ex. 7* [#1-1] at 13).  On January 5, 2015, he wrote her yet another Trulincs Request "informing Ruda that [Plaintiff] had been locked down for 3 days now without any food," but Defendant Ruda did not respond.  *Second Am. Compl.* [#13] at 7 (citing *Pl.'s Ex. 8* [#1-1] at 14).  On March 31, 2015, Plaintiff wrote another Trulincs Request to Defendant Ruda, "detailing that [Plaintiff] had not been receiving food for 4 weeks," providing "the proof that all the other facilities on the FPC compound were in fact serving gluten free meals," and asking "why is he being singled out and not being provided food."  *Second Am. Compl.* [#13] at 8 (citing *Pl.'s Ex. 18* [#1-1] at 27).  (The Court recognizes the inherent lack of credibility in the statement that Plaintiff received no food for 4 weeks, as human beings generally cannot survive without any food for that length of time.  Nevertheless, the Court views the allegations in the light most favorable to Plaintiff.)  On April 4, 2015, Plaintiff wrote another Trulincs Request to Defendant Ruda, "detailing another day with no food, and the fact that all the new FPC

Food Service Staff do not have any idea of what to feed" him.  *Second Am. Compl.* [#13] at 9 (citing *Pl.'s Ex. 19* [#1-1] at 28).

As mentioned above, on April 6, 2015, Plaintiff wrote a Trulincs Request to Defendant Ruda about the actions of Defendant Saint; she told him to confront Defendant Saint and demand to be fed, which he did, although Defendant Saint refused to help. *Second Am. Compl.* [#13] at 9.  Plaintiff then detailed for Defendant Ruda the "hateful, coordinated and tormenting" actions of Defendant Saint, begging her for help.  *Id.* (citing *Pl.'s Ex. 20* [#1-1] at 29).  The next day Plaintiff met with Defendant Saint and Defendant Ruda.  *Id.*  They told Plaintiff "that if he continues to ask for food, that they will take his actions as a threat to staff, and have him placed into solitary confinement."  *Id.* at 9-10.

With respect to the alleged actions regarding Defendant Ruda after August 21, 2015, Plaintiff alleges that on August 30, 2015, he wrote a "Trulincs Request" to Defendant Ruda "concerning the fact that the staff is hard pressed to find foods for [Plaintiff's] diet."  *Second Am. Compl.* [#13] at 11 (citing *Pl.'s Ex. 26* [#1-1] at 35).  On March 14, 2016, Plaintiff wrote an Inmate Request to Staff to Defendant Ruda and Warden Stancil in which he described "that CO Harrison refuses to provide food to the Gluten free inmates, that the inmate staff is so upset that they are harassing [Plaintiff], tampering with his food, dropping it on the floor, holding it with their bare hands, plus many other terrifying ways.  For the 100th time, please help me eat."  *Second Am. Compl.* [#13] at 12-13 (citing *Pl.'s Ex. 32* [#1-1] at 40).  On April 7, 2016, Plaintiff filed a "Trulincs Request" with Defendant Ruda "concerning an [sic] verbal attack upon [Plaintiff] by CO Thomas and inmate staff Jeanetta. [Plaintiff] denotes tampering with his food, and the fact that Gluten foods were being added to [Plaintiff's] meals."  *Second Am. Compl.* [#13] at 13 (citing *Pl.'s Ex. 32* [#1-1] at 40).

Plaintiff wrote generally similar complaints about food to Defendant Ruda on January 15, February 8, and March 10, 2017. *Id.* at 14 (citing *Pl.'s Exs. 37, 38, 40* [#1-1] at 45, 46, 48).

On March 10, 2017, Defendant Harrison allegedly told Plaintiff that Defendant Ruda "told her not to feed the Gluten-Free inmates, as she does not have any paperwork proving that they are in fact Gluten Free." *Second Am. Compl.* [#13] at 15. Three days later, Plaintiff met with Defendant Ruda. *Id.* Plaintiff described the meeting as follows:

> Ruda demands that [Plaintiff] show her paperwork proving that he should receive Gluten-Free meals after 3.5 years of this fight. [Plaintiff] produces from his pocket, as he keeps a copy of his medical duty status with him at all times, along with his typed detailed description of his condition, and presents it to Ruda. Ruda states that this paperwork can not be correct, as she has reviewed [Plaintiff]s medical records (in violation of HIPPA) and asks [Plaintiff] to meet her at once in medical. Ruda requests the medical staff on duty to remove from [Plaintiff's] Medical Duty Status the comment that [Plaintiff] is to receive gluten-free diet indefinitely for medical reasons. The medical staff person, then looks up [Plaintiff's records, and his hosptial [sic] records, and turn's [sic] and tell's [sic] Ruda that [Plaintiff] suffers from Celiac's Disease and can not eat Gluten. Ruda again asks to just have the words removed from the form. He agrees, and then tells her that he can not print the form, but will email it to her. The [n]ext day, [Plaintiff] goes to medical records and get a copy of the paperwork that was done the day before, only to discovery that the medical staff did not change the form as requested by [Defendant Ruda], but in fact issued a new directive to food service with the same statement "Inmate is authorized to have gluten-free diet indefinitely for medical reason." [Plaintiff] is told by other FPC Food Service Staff that Ruda was very mad when she seen [sic] the new form.

*Id.* (citing *Pl.'s Ex. 47* [#1-1] at 61).

Finally, Plaintiff asserts the following: (1) on October 21, 2016, Defendant Ruda directly supervised [Plaintiff's] meal service, and he only received 25% of the required food; (2) on January 20, 2017, Defendant Ruda "directly supervised" that Plaintiff did not receive any edible food; (3) on February 10, 2017, Defendant Ruda "directly supervised" that Plaintiff's meal was inedible, and thus Plaintiff received no food to eat; (4) on March 10,

2017, Defendant Ruda "directly supervised that [Plaintiff] did not receive any food," and (5) on April 7, 2017, Defendant Ruda "was directly involved in an [sic] campaign of harassment of [Plaintiff] in front of BOP staff and inmates during the lunch services, witnessed and documented by other inmates." *Second Am. Compl.* [#13] at 21.

Part of Plaintiff's Eighth Amendment claim against Defendant Ruda appears to be predicated on a supervisory-liability theory. *See Second Am. Compl.* [#13] at 17. In a § 1983 lawsuit, "supervisory liability allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, or implements a policy which subjects, or causes to be subjected that plaintiff to the deprivation of any rights secured by the Constitution." *Cox*, 800 F.3d at 1248 (citations and internal alterations omitted). This is not the same as "liability under a theory of respondeat superior." *Id.* "A plaintiff arguing for the imposition of supervisory liability therefore must show an 'affirmative link' between the supervisor and the constitutional violation." *Id.* (internal quotation marks omitted)

Demonstration of an "affirmative link" between a supervisor and the alleged constitutional injury requires (1) personal involvement, (2) sufficient causal connection, and (3) culpable state of mind. *Id.* "Admittedly, the contours of supervisory liability are still somewhat unclear after the Supreme Court decided *Iqbal*, which articulated a stricter liability standard for personal involvement." *Id.* at 1248-49 (citations and internal alterations omitted) (citing *Dodds v. Richardson*, 614 F.3d 1185, 1198 (10th Cir. 2010) ("Much has been made about [the supervisory-liability] aspect of *Iqbal*, but consensus as to its meaning remains elusive."). Regardless, the Tenth Circuit's "particularized approach [still] applies with full force when a plaintiff proceeds under a theory of supervisory liability." *Cox*, 800 F.3d at 1249 (quoting *Pahls v. Thomas*, 718 F.3d 1210, 1226 (10th Cir. 2013). The Court

continues to require plaintiffs to demonstrate "that each defendant acted with the constitutionally requisite state of mind" by "identify[ing] . . . specific policies over which particular defendants possessed supervisory responsibility[ ] that violated their clearly established constitutional rights." *Pahls*, 718 F.3d at 1228.

A supervising prison official may be liable "[w]here there is essentially a complete failure to train, or training that is so reckless or grossly negligent that future misconduct is almost inevitable." *Keith v. Koerner*, 843 F.3d 833, 838 (10th Cir. 2016) (citation omitted). "It is not enough to allege 'general deficiencies' in a particular training program." *Id.* "Rather, a plaintiff must identify a specific deficiency in the entity's training program closely related to his ultimate injury, and must prove that the deficiency in training actually caused his jailer to act with deliberate indifference to his safety." *Id.* (internal alterations omitted).

Defendants argue that Defendant Ruda's "status as a supervisor does not establish the required personal participation necessary . . . ." *Motion* [#32] at 18. However, the totality of their supporting argument consists of two undeveloped points: (1) "Most of Plaintiff's allegations about Ruda are that he complained to her *after* others allegedly failed to feed him as he wanted. Ruda cannot be liable . . . for the acts of other[s] she learned of only after the fact," and (2) "Plaintiff also fails to allege how Ruda's supervision allegedly caused the deprivations of which he complains. In fact, Plaintiff alleges at least two levels of actors between Ruda and Plaintiff—the correctional officers (some of whom are Defendants) and inmate staff with food-service responsibilities." *Id.* at 19.

Defendants are correct that Defendant Ruda cannot be held liable for the acts of her subordinates of which she became aware only after the fact, and that Plaintiff alleges that often subordinate correctional officers and/or food-service inmates provided (or failed to

provide) Plaintiff with adequate food.  However, Defendants fail to address the allegations which show that Defendant Ruda was the moving force behind some of these food issues, such as, for example, Defendant Harrison telling Plaintiff that Defendant Ruda had "told her not to feed the Gluten-Free inmates," or Defendant Ruda "directly supervis[ing]" on a number of occasions that Plaintiff received inadequate or no food.  *Second Am. Compl.* [#13] at 15, 21.  In the absence of sufficient argument addressing these types of allegations, the Court cannot find that Plaintiff's claim fails for the reasons argued by Defendants.

Accordingly, in the absence of further argument, the Court **recommends** that Defendants' Motion [#32] be **denied** to the extent it seeks dismissal of Plaintiff's Eighth Amendment claim against Defendant Ruda.

## H.    Individual Capacity *Bivens* Claims

Finally, the Court addresses Defendant's *Bivens* argument with respect to Plaintiff's First Amendment claim against Defendant Ruda in her individual capacity and Plaintiff's Eighth Amendment claims against all Defendants in their individual capacities.

*Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971), "creates a cause of action only against federal officials in their individual capacities for money damages . . . ."  *James v. Hamaker*, No. 15-cv-02425-GPG, 2016 WL 409433, at *1 (D. Colo. Feb. 3, 2016) (citing *Simmat*, 413 F.3d at 1231; *Farmer v. Perrill*, 275 F.3d 958, 963 (10th Cir. 2001)).  In *Bivens*, the United States Supreme Court "held that, even absent statutory authorization, it would enforce a damages remedy to compensate persons injured by federal officers who violated the prohibition against unreasonable search and seizures"

under the Fourth Amendment. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1854 (2017). The Supreme Court has only twice since then recognized *Bivens* claims. *Id.* at 1854-55. In *Davis v. Passman*, 442 U.S. 228 (1979), "an administrative assistant sued a Congressman for firing her because she was a woman," and the Supreme Court "held that the Fifth Amendment Due Process Clause gave her a damages remedy for gender discrimination." *Id.* In *Carlson v. Green*, 446 U.S. 14 (1980), "a prisoner's estate sued federal jailers for failing to treat the prisoner's asthma," and the Supreme Court "held that the Eighth Amendment Cruel and Unusual Punishments Clause gave him a damages remedy for failure to provide adequate medical treatment." *Id.* at 1855. "[E]xpanding the *Bivens* remedy is now a 'disfavored' judicial activity," and the Supreme Court "has 'consistently refused to extend *Bivens* to any new context or new category of defendants.'" *Id.* at 1857 (quoting *Iqbal*, 556 U.S. at 675; *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001)); *see also Wilkie v. Robbins*, 551 U.S. 537, 549-550 (2007) (summarizing the basic considerations underlying past Supreme Court decisions declining to create *Bivens* claims and applying a two-part analysis to the creation of *Bivens* liability).

### a. First Amendment Claim

The first step in determining whether a *Bivens* claim can proceed is to determine whether the case presents a new *Bivens* context. *Ziglar*, 137 S. Ct. at 1859-60. "The proper test for determining whether a case presents a new *Bivens* context is as follows." *Id.* at 1859. "If the case is different in a meaningful way from previous *Bivens* cases decided by this Court, then the context is new." *Id.* In other words, the Court should determine whether the claims at issue differ meaningfully from "a claim against FBI agents for handcuffing a man in his own home without a warrant; a claim against a Congressman

for firing his female secretary; and a claim against prison officials for failure to treat an inmate's asthma." *Id.* The test is more than simply determining "whether the asserted constitutional right was at issue in a previous *Bivens* case," and, if so, "whether the mechanism of injury was the same mechanism of injury in a previous *Bivens* case." *Id.* at 1859. Rather, as a non-exhaustive list of examples, "[a] case might differ in a meaningful [enough] way [to make a given context a new one] because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider." *Id.* at 1860.

Although little case law currently exists about this fact-intensive inquiry due to the recentness of the *Ziglar* decision, the Court has little trouble determining that the First Amendment issue raised in Plaintiff's case constitutes a new context, simply because the trio of *Bivens* cases did not include a First Amendment claim, but rather only Fourth, Fifth, and Eighth Amendment claims. The undersigned has already carefully considered this legal issue in a previous lawsuit and reached the conclusion that a *Bivens* remedy does not exist for First Amendment retaliation claims in the prison context.[18] *See Shepherd v.*

_____

[18] The Court notes that most circuit courts appear to avoid resolving the issue of whether a *Bivens* claim exists when other grounds for resolving the underlying motion exist, such as failure to state a claim or qualified immunity. *See, e.g.*, *McGowan v. United States*, 825 F.3d 118, 123 (2d Cir. 2016) (stating in connection with the issue of whether a First Amendment *Bivens* remedy against BOP employee should be recognized: "We need not decide this difficult issue, however, because we conclude that [the plaintiff's] *Bivens* claim fails for the independent reason that [the]

*Rangel*, No. 12-cv-01108-RM-KLM, 2014 WL 7366662, at *6, 15-18 (D. Colo. Dec. 24, 2014) (adopting Recommendation of the undersigned after conducting a de novo review).[19]

The Court recently declined to extend *Bivens* liability to claims against prison officials in their individual capacities for an alleged violation of a prisoner's First Amendment rights. *Saleh v. United States*, No. 09-02563, 2011 WL 2682803, at *10-12 (D. Colo. Mar. 8, 2011), *overruled in part on other grounds*, No. 09-02563, 2011 WL 2682728 (D. Colo. July 8, 2011). In *Saleh*, the Court found no *Bivens* remedy for a prisoner's First Amendment Claim because (1) the Supreme Court has never explicitly extended *Bivens* to the First Amendment, and (2) other adequate avenues of relief for litigating the injury were available to the plaintiff. *Id.* at *11; *see also Schweiker v. Chilicky*, 487 U.S. 412, 421-23 (1988); *Bush v. Lucas*, 462 U.S. 367, 386-88 (1983) (holding that, even assuming a First Amendment violation had occurred and acknowledging that the administrative "remedies do not provide complete relief for the plaintiff[,]" a *Bivens* action was inappropriate because the Congressionally installed administrative system "provide[d] meaningful remedies for employees who may have been unfairly disciplined").

The Supreme Court has never recognized that federal prisoners have a right of

---

defendant . . . is entitled to qualified immunity."). Here, the Court notes, as discussed above, that the First Amendment claim against Defendant Ruda should survive the dismissal motion on the merits. The Court further notes (without deciding) that Defendants' qualified immunity argument on this point may be insufficient, and therefore the Court addresses the issue of whether a *Bivens* remedy against an individual exists under the circumstances of this case on this First Amendment claim. The same applies for the Eighth Amendment claims against Defendants Ruda, Harrison, Thomas, McClendon, Versaw, and Saint, discussed below.

[19] There is some support in the Tenth Circuit for a *Bivens* remedy under the First Amendment solely in the context of an alleged violation of organizational and associational rights outside of prison, i.e., in connection with issues between tax protestor organizations and the Internal Revenue Service. *Nat'l Commodity & Barter Ass'n v. Archer*, 31 F.3d 1521, 1530-31 (10th Cir. 1994). However, this case appears to have no relevance to the facts of the present lawsuit.

action for damages against federal officials pursuant to *Bivens* for First Amendment violations. *Saleh*, 2011 WL 2682803, at *11. In fact, the Supreme Court has explicitly refused to acknowledge that federal prisoners may bring a claim for monetary damages based on an alleged First Amendment violation. *See, e.g.*, *Iqbal*, 556 U.S. at 675 (noting that the Court had "declined to extend *Bivens* to a claim sounding in the First Amendment"); *see also Bush*, 462 U.S. at 390 (citing *United States v. Standard Oil Co.*, 332 U.S. 301, 302 (1947)) (declining "to create a new substantive legal liability without legislative aid" by declining to recognize a right to seek damages for alleged First Amendment violation pursuant to *Bivens*). The Court suggested in *Saleh* that such claims may not have been recognized by the Supreme Court because prisoners may pursue Federal Tort Claims Act claims or claims for injunctive relief, regardless of the availability of a *Bivens* damages claim. 2011 WL 2682803, at *11; *see Wilkie*, 551 U.S. at 550 (noting that adequate, alternative bases for pursuing a particular claim amount "to convincing reason for the Judicial Branch to refrain from providing new and freestanding remedy in damages"); *Bush*, 462 U.S. at 386; *cf.* 42 U.S.C. § 1997e(e) (noting that prisoners are not entitled to claim for money damages where no physical injury is shown).

Since this Court's decision in *Saleh*, the Supreme Court has reaffirmed that it has never held that *Bivens* extends to First Amendment claims. *Reichle v. Howards*, 132 S. Ct. 2088, 2093 n.4 (2012). The Supreme Court noted in *Minneci v. Pollard*, 132 S. Ct. 617, 623 (2012), that *Wilkie* fairly summarizes the basic considerations that underlie past Supreme Court decisions declining to create *Bivens* claims. *See Wilkie*, 551 U.S. at 550. In *Wilkie*, the Supreme Court identified two questions relating to whether to recognize a *Bivens* remedy:

In the first place, there is the question whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages. [citation omitted] . . . [E]ven in the absence of an alternative, a *Bivens* remedy is a subject of judgment, [and] "the federal courts must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counselling hesitation before authorizing a new kind of federal litigation."

*Id.* (quoting *Bush*, 462 U.S. at 378); *see also Bush*, 462 U.S. at 386-388 (denying *Bivens* liability for a federal employee's claim that his federal employer dismissed him in violation of the First Amendment because Congressionally created federal civil service procedures provide meaningful redress); *Chappell v. Wallace*, 462 U.S. 296, 298-300 (1983) (finding no implied *Bivens* action for a claim by military personnel that military superiors violated various constitutional provisions because there were special factors related to the military that weighed against implying a *Bivens* action); *see also United States v. Stanley*, 483 U.S. 669, 683-684 (1987) (similar).

Thus, the Court must address whether there were alternative remedies available to Plaintiff. In *Davis v. Passman*, 442 U.S. at 242, the Supreme Court held that persons who have "no [other] effective means" of redress "must be able to invoke the existing jurisdiction of the courts for the protection of their justiciable constitutional rights." However, Plaintiff has at least three alternative, existing processes to protect his First Amendment interests here.

First, he may seek injunctive relief, and indeed does so in this case. *See Malesko*, 534 U.S. at 74. Unlike the *Bivens* remedy, which courts "have never considered a proper vehicle for altering an entity's policy, injunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally." *Malesko*, 534 U.S. at

74. While injunctive relief remains available, the Court is unconvinced that money damages are necessary to deter unconstitutional conduct. *See, e.g.*, *Williams v. Klien*, 20 F. Supp. 3d 1171, 1175 (D. Colo. 2014) (recognizing that the Courts have not permitted *Bivens* claims for damages raised by prison inmates because prisoners may pursue claims for injunctive relief based on an alleged violation of the First Amendment). In fact, the existence of a monetary remedy is simply not required by applicable precedent or American jurisprudential principles to foreclose *Bivens* relief. *See, e.g.*, *K.B. v. Perez*, 178 F. Supp. 3d 1108, 1112 (D. Colo. 2016) (holding that there is no implied damages action in a *Bivens* lawsuit against federal officers in violation of the right to familial association arising either under the First Amendment or the Fifth Amendment) (citing *Schweiker*, 487 U.S. at 421-22 ("The absence of statutory relief for a constitutional violation . . . does not by any means necessarily imply that courts should award money damages against the officers responsible for the violation.")).

Second, Plaintiff may seek a remedy under the mandamus statute, 28 U.S.C. § 1361. *See Custard v. Allred*, No. 13-cv-02296-REB-CBS, 2015 WL 328626, at *4 (D. Colo. Jan. 26, 2015) (declining to extend a *Bivens* damages remedy where alternative avenues of relief existed, in part because "Plaintiff could also pursue a remedy through the mandamus statute"). For mandamus to issue, there must be a clear right to the relief sought, a plainly defined and peremptory duty on the part of respondent to do the act in question, and no other adequate remedy available. *Hadley Mem'l Hosp., Inc. v. Schweiker*, 689 F.2d 905, 912 (10th Cir. 1982). Plaintiff must also show that his right to the writ is "clear and indisputable." *See Mallard v. U.S. Dist. Court for the S. Dist. of Iowa*, 490 U.S. 296, 309 (1989) ("To ensure that mandamus remains an extraordinary remedy, petitioners

must show that they lack adequate alternative means to obtain the relief they seek . . . and carry the burden of showing that [their] right to issuance of the writ is clear and indisputable[.]") (citation omitted); *United States v. Carrigan*, 778 F.2d 1454, 1466 (10th Cir. 1985).

Third, Plaintiff may seek remedy for his concerns through the prisoner grievance system. *Simmat*, 413 F.3d at 1237; 28 C.F.R. §§ 542–542.19 (BOP Administrative Remedy Program through which prisoner can seek formal review of any aspect of confinement). Inmates in Plaintiff's position have full access to remedial mechanisms established by the BOP, including grievances filed through the BOP's Administrative Remedy Program. *See* 28 C.F.R. § 542.10 (explaining this program as providing "a process through which inmates may seek formal review of an issue which relates to any aspect of their confinement"). This program provides yet another means through which allegedly unconstitutional actions may be brought to the attention of the BOP and prevented from recurring. *See, e.g.*, *Custard*, 2015 WL 2407103, at *6 (holding that alternative remedies existed which militated against extending *Bivens* damages, in part because the plaintiff could "also pursue administrative relief through the BOP's administrative remedy program, and apparently has done so"). This method has the added benefit of limiting judicial interference with prison management while maintaining a method of redress for valid constitutional claims. *See, e.g.*, *Wolff v. McDonnell*, 418 U.S. 539, 566-67 (1974) ("The operation of a correctional institution is at best an extraordinarily difficult undertaking. . . . [Correctional officers] must have the necessary discretion without being subject to unduly crippling constitutional impediments.").

These alternative remedies foreclose the creation of a *Bivens* remedy for Plaintiff's

First Amendment claim. "[T]here is no reason to rely on a court-created remedy, like *Bivens*, when Congress has created an adequate means for obtaining legal redress." *Simmat*, 413 F.3d at 1231.

The Court also examines whether any special factors exist to counsel against the creation of a *Bivens* remedy. The Court may create a new *Bivens* remedy only if there are no special factors counseling hesitation against the creation of such a remedy. *Wilkie*, 551 U.S. at 550. "[T]he inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Ziglar*, 137 S. Ct. at 1857-58. "Thus, to be a 'special factor counselling hesitation,' a factor must cause a court to hesitate before answering that question in the affirmative. *Id.* at 1858. The plain meaning of the language suggests that the threshold for finding special factors is quite low:

> The only relevant threshold—that a factor "counsels hesitation"—is remarkably low. It is at the opposite end of the continuum from the unflagging duty to exercise jurisdiction. Hesitation is a pause, not a full stop, or an abstention; and to counsel is not to require. "Hesitation" is "counseled" whenever thoughtful discretion would pause even to consider.

*Arar v. Ashcroft*, 585 F.3d 559, 574 (2d Cir. 2009).

In the case at hand, the factors counseling hesitation are more than sufficient to meet this low threshold. In the context of prison management, the Supreme Court recognizes the value of balancing inmates' interests against the administrative needs of the prison, noting that a degree of flexibility and accommodation of prison discretion is required. *See, e.g.*, *Wolff*, 418 U.S. at 566-67 (stating that correctional institutions "must have the necessary discretion without being subject to unduly crippling constitutional impediments[.]"). Courts owe substantial deference to the professional judgment of prison

administrators, and absent concerns that prison inmates will be otherwise unable to redress their claims, this Court hesitates to create a new cause of action that may be brought against prison officials for monetary damages. *See Beard v. Banks*, 548 U.S. 521 (2006) (Justice Breyer, with two Justices and the Chief Justice concurring, two Justices concurring in the judgment).

As discussed previously, prisoners already have a variety of ways to pursue First Amendment claims, and denying *Bivens* claims for money damages will not deny prisoners effective relief for their claims. On the other hand, creating a superfluous way for prisoners to gain relief by suing prison employees individually will interfere with prison management and add to the Court's already heavy burden of prisoner litigation. *See K.B.*, 178 F. Supp. 3d at 1112 ("[E]xtending *Bivens* in this case would potentially permit a huge number of claims from families of offenders seeking to challenge particular conditions of offenders' confinement or particular conditions of offenders' probation/supervised release. The Court finds this potential result to be a special factor that counsels against creation of a new *Bivens* remedy in this case."). These special factors are sufficient to counsel hesitation in creating a new *Bivens* remedy.

A *Bivens* damages remedy "is not an automatic entitlement . . . and in most instances we have found a *Bivens* remedy unjustified." *Wilkie*, 551 U.S. at 550. As both of the above factors weigh against extending *Bivens* to First Amendment claims in the context of federal prisons, the Court agrees with Defendants that here, there is no legal basis to recognize any claim for damages against Defendant Ruda in her individual capacity on these underlying allegations with respect to Plaintiff's First Amendment claim.

Accordingly, the Court finds that there is no *Bivens* remedy under the First

Amendment under the circumstances of this case, and therefore the Court **recommends** that Plaintiff's First Amendment claim be **dismissed with prejudice** to the extent it is asserted against Defendant Ruda in her individual capacity. *See Reynoldson*, 907 F.2d at 127.

### b. Eighth Amendment

Having thoroughly addressed Plaintiff's First Amendment *Bivens* claim above, the Court can more concisely address Plaintiff's Eighth Amendment *Bivens* claims here. First, the Court has little trouble determining that the Eighth Amendment issue raised in Plaintiff's case constitutes a new context, because the only one of the trio of *Bivens* cases which addressed the Eighth Amendment was *Carlson v. Green*, 446 U.S. 14 (1980), in which, as a reminder, a prisoner's estate sued federal jailers for failing to treat the prisoner's asthma, as a result of which the prisoner died. Here, Plaintiff's claim is focused on inadequacy of prison conditions in the form of food, which has not been so severe as to kill him. Given the Supreme Court's detailed discussion regarding the low threshold for finding a new context, *see Ziglar*, 137 S. Ct. at 1859-60, the Court has finds that this case bears little resemblance to *Carlson* and therefore that this case constitutes a new context. *See also Ziglar*, 137 S. Ct. at 1864 (stating that "even a modest extension is still an extension").

Thus, the Court must address whether there were alternative remedies available to the incarcerated plaintiff. As discussed above, Plaintiff has at least three alternative, existing processes to protect his Eighth Amendment constitutional interests in this context: injunctive relief, mandamus, and the prisoner grievance system. These alternative remedies foreclose the creation of a *Bivens* remedy for Plaintiff's Eight Amendment claims.

Finally, the special factors counseling hesitation are more than sufficient to meet the low threshold, given that the courts owe substantial deference to the professional judgment of prison administrators and that prison inmates can otherwise redress their claims. *See Ziglar*, 137 S. Ct. at 1858 (stating that "to be a 'special factor counselling hesitation,' a factor must cause a court to hesitate before answering . . . in the affirmative" "whether the judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed").

Accordingly, the Court finds that there is no *Bivens* remedy under the Eighth Amendment under the circumstances of this case, and therefore the Court **recommends** that Plaintiff's Eighth Amendment claims be **dismissed with prejudice** to the extent they are asserted against Defendants in their individual capacity based on inadequacy of food. *See Reynoldson*, 907 F.2d at 127.

However, to the extent Plaintiff asserts his claim against Defendants Ruda and Defendant Saint in their individual capacities on the basis of his sigmoid diverticulosis injury, the Court **recommends** that the Eighth Amendment claims be **dismissed without prejudice** against them. Although the Court makes no comment at this time regarding whether its analysis here would change, the Court notes that the allegations are unclear regarding the permanence of this injury or the long-term effects this injury could have on the rest of Plaintiff's life. Allegations to this effect *might* have an impact on the *Bivens* analysis here, and thus the Court recommends dismissal without prejudice.

I.     **Amendment**

As noted above, the Court recommends allowing Plaintiff to amend his Eighth

Amendment claims. If he is permitted to amend, the Court notes that Plaintiff should consider providing some or all of the following specific information: (1) details regarding whether and when Plaintiff has ever been diagnosed by a *physician* as having celiac disease; (2) details regarding which specific Defendants received Plaintiff's notices to staff about his issues stemming from celiac disease and need to have a special diet, given that Plaintiff has also alleged that most staff (with the exception of Defendant Pena) rotated every three months on and off of food-line duty; (3) details regarding whether, to Plaintiff's knowledge, any Defendant knew that any other persons were also not regularly or adequately feeding Plaintiff; (4) details regarding injuries sustained (and as precisely as possible *when* they were sustained) during the statute of limitations; (5) details regarding whether each Defendant in this matter failed to feed Plaintiff on more days than the "examples" provided by Plaintiff in the Second Amended Complaint, how many days each Defendant failed to feed Plaintiff, and over what time period this occurred;[20] and (6) details regarding the permanence or long-term effect of sigmoid diverticulosis on Plaintiff's life.

## IV. Conclusion

For the foregoing reasons,

IT IS HEREBY **RECOMMENDED** that the Motion [#32] be **GRANTED in part and DENIED in part**. The Court **recommends** that the Motion be **granted** with respect to Plaintiff's ADA claims, Fourteenth Amendment claims, First Amendment claims **except** for Defendant Ruda in her official capacity, and Eighth Amendment claims **except** for

---

[20] Plaintiff need not provide every specific date. However, as discussed thoroughly above, it is important for Plaintiff to sufficiently allege how often he missed meals or was grossly inadequately fed by each separate Defendant.

Defendants Ruda, Saint, Harrison, Thomas, Versaw, and McClendon in their official capacities, to the extent discussed above. The Court **recommends** that the Motion be **denied** with respect to Plaintiff's First Amendment claim against Defendant Ruda in her official capacity and Eighth Amendment claims against Defendants Ruda, Saint, Harrison, Thomas, Versaw, and McClendon in their official capacities, to the extent discussed above. Consequently, the Court **recommends** that Defendants Pena and Boling be **dismissed** in full from this lawsuit.

IT IS FURTHER **RECOMMENDED** that Plaintiff be permitted one further opportunity to amend the complaint regarding his Eighth Amendment claims only and that he be permitted to do so within twenty-one (21) days of final resolution of this Motion to Dismiss [#32].

IT IS FURTHER **ORDERED** that the Order to Show Cause [#37] is **DISCHARGED** with respect to Defendant Thomas in her official capacity.

IT IS FURTHER **ORDERED** that the Order to Show Cause [#37] is made **ABSOLUTE** with respect to Defendant Thomas in her individual capacity.

IT IS FURTHER **RECOMMENDED** that Defendant Thomas in her individual capacity be **DISMISSED without prejudice**.[21]

IT IS FURTHER **ORDERED** that pursuant to Fed. R. Civ. P. 72, the parties shall have fourteen (14) days after service of this Recommendation to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is

---

[21] If this Recommendation is adopted in full, and in the absence of adequate amendment, the following claims will remain: (1) First Amendment retaliation against Defendant Ruda in her official capacity, and (2) Eighth Amendment deliberate indifference claims against Defendants Ruda, Harrison, Thomas, McClendon, Versaw, and Saint in their official capacities.

assigned. A party's failure to serve and file specific, written objections waives de novo review of the Recommendation by the District Judge, Fed. R. Civ. P. 72(b); *Thomas v. Arn*, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions. *Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1210 (10th Cir. 1999); *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996). A party's objections to this Recommendation must be both timely and specific to preserve an issue for de novo review by the District Court or for appellate review. *United States v. One Parcel of Real Prop.*, 73 F.3d 1057, 1060 (10th Cir. 1996).

Dated: August 17, 2018

BY THE COURT:

Kristen L. Mix
United States Magistrate Judge